SEARLES BROS. *v.* SMITH GRAIN COMPANY ET AL.

1. SALES. *Draft with bill of lading. Transfer by consignor. Rights of consignee.* Code 1892, § 3503.

   A bank which has bought a consignor's draft for the price of grain, and taken an assignment of the bill of lading therefor, occupies, as to the consignee, the situation of the consignor, and the consignee, after paying the draft and receiving the bill of lading and grain, may subject the proceeds of the draft in the hands of a collecting bank to his demand for damages resulting from shortage in weights and the failure of the consignor to deliver all of the grain included in the contract of sale.

2. SAME. *Attachment. Nonresident. National bank.* Rev. Stat. U. S., 1878, sec. 5242. Code 1892, §§ 486, 487.

   Where a nonresident national bank buys a draft for the price of grain from a nonresident consignor, with a bill of lading of the grain attached, and the resident consignee, after paying the draft, resorts to an attachment in chancery to subject the proceeds of the draft in the hands of a resident state bank to his demand for damages arising out of the consignor's breach of contract for the sale of the grain, there is no attachment against the national bank, which, although a defendant, is a mere claimant of the fund, and the proceeding is not within the federal statute (Rev. Stat. U. S., 1878, sec. 5242) providing that no attachment shall issue against any national bank or its property before final judgment in any suit.

FROM the chancery court of Warren county.

HON. W. C. MARTIN, Chancellor.

Searles Bros., appellants, were complainants in the court below; the Smith Grain Company and others, appellees, were defendants there.

Searles Bros. filed a bill in the chancery court of Warren county, in attachment, under §,486 of the code of 1892, against the Smith Grain Company and the Exchange National Bank, both of Little Rock, Ark., and the Merchants' National Bank and the Vicksburg Bank, of Vicksburg, Miss., in which they allege that they purchased a lot of corn from the Smith Grain Company at a fixed price; that only a part of the corn was shipped; and that, in order to supply their customers, they were compelled to go into the market and buy other corn at a higher price; that the corn shipped them was defective in quality, whereby they suffered loss; that for the corn shipped them the Smith Grain Company drew on them for $364 in favor of the Exchange National Bank, and that they paid said draft through the Vicksburg Bank. They allege, further, that on a different date they bought other corn, and suffered losses in the same way as above averred, and that the Smith Grain Company drew on them, through the Exchange National Bank, for $245.22, which was paid through the Merchants' National Bank of Vicksburg; that the proceeds of the two drafts were in the possession of said resident banks. The prayer was for judgment against the defendants, and that the money in the said banks, or so much as might be necessary to cover amount due them, be turned over to them, and that the Exchange National Bank be required to come into court, and show cause why said order should not be made. The Vicksburg banks answered, admitting that they held the money which was collected on the drafts attached to the bills of lading on the shipment of corn to complainants, which were payable to the Exchange National Bank of Little Rock, Ark., and offering to pay the money into court to await the determination of the matter by the court.

80 Miss.—44

---

The Smith Grain Company did not answer the bill at all. The Exchange National Bank answered, setting up that it was a purchaser of the corn in good faith, for value, without notice of any contract between complainants and the Smith Grain Company, or any failure on the part of the Smith Grain Company to carry out its contracts with complainants. It set up the further defense that it was a national bank within the meaning of sec. 5242 of the revised statutes of the United States, and that under that section this attachment suit could not be maintained against it, and that the court was without jurisdiction to determine their rights in the matter. Testimony was taken to show complainants' losses under the contracts with the Smith Grain Company as alleged in the bill. The court, on final hearing, dismissed the bill as to all the defendants. From that decree complainants appealed.

*McLaurin, Armistead & Brien,* for appellants.

1. The right of the appellans to subject the proceeds of the draft in the hands of the Vicksburg banks is no longer an open question in this state. *Miller* v. *Bank,* 76 Miss., 84.

2. This proceeding was brought under §§ 486, 487, code 1892, and is in the nature of a garnishment, the claim of the Exchange National Bank having no other effect than to present a claimant's issue as to the money held by the garnishee. In this view of the case the federal statute relied upon by appellees has no application, and the court below had full jurisdiction to determine the rights of the parties.

*Catchings & Catchings,* for appellees.

1. It is contended by counsel for appellant that the proceeding by attachment in chancery is not an attachment within the meaning of the United States statute. They argued before the chancellor that it was rather in the nature of a garnishment proceeding.

So far as the Exchange National Bank is concerned, there is

nothing in the case which even resembles garnishment. It was not summoned as garnishee holding possession of property of the Smith Grain Company. The property involved was not in its possession, but in the possession of the Vicksburg banks, and they were summoned as garnishees.

The decree was sought against the Exchange National Bank and · the Smith Grain Company absolutely, and a liability against the Exchange National Bank, at least to the extent of the funds in the hands of the Vicksburg banks.

The theory was that whether· the effects in the hands of the Vicksburg banks belonged to the Exchange National Bank or to the Smith Grain Company, they might be attached and subjected to the complainant's claim, and the purpose of the bill was to so subject them.

The summonses for the Vicksburg banks makes this clear beyond a doubt, and they did bind the effects in their possession.

The Exchange National Bank was restrained by this proceeding, which bound up .its effects in the hands of the Vicksburg banks, from acquiring possession of them, and applying them to their own use. *Pacific National Bank* v. *Mixter,* 124 U. S., 727; *Safford* v. *First National Bank,* 61 Vt., 374.

Section 486 of the code with regard to attachments in chancery must be read as though it contained a provision in express terms that it was not to apply to suits against national banks. See, also, *Cudabac* v. *Strong,* 67 Miss., 709; *First National Bank* v. *LaDue,* 39 Minn., 416; *Freeman Manufacturing Co.* v. *National Bank of Republic,* 160 Mass., 399.

2. We insist that the property covered by a bill of lading like the one in question cannot be subjected to the claim of creditors of the shipper, and cite the following authorities: *Pollard* v. *Venton,* 105 U. S., 8; *Bank of Commerce* v. *National Bank of Memphis,* 91 U. S., 92; *First· National Bank* v. *Mt. Pleasant Milling Co.,* ·103 Ia., 518; *Neill* v. *Rodgers Bros. Produce Company,* 41 W. Va., 37; *Hathoway* v. *Haynes,* 124·

Mass., 301; *Holmes* v. *Bayley,* 92 Pa. St., 57; *Holmes* v. *Bank,* 96 Pa. St., 525; *Coker* v. *First National Bank of Memphis,* 112 Ga., 71; *Ayres et al.* v. *Dorsey Produce Co.,* 101 Ia., 141; *Dows* v. *National Exchange Bank,* 91 U. S., 618; *Mo. Pac. Ry. Co.* v. *Heidenheimer,* 82 Tex., 195; *Union Pac. Ry. Co.,* v. *Johnson,* 45 Neb., 57; *Midland National Bank* v. *Mo. Pac. Ry. Co.,* 132 Mo., 492; *Landa* v. *Lattin,* 19 Tex. Civ. App., 246; *Dickens* v. *Merchant's Elevator Co.,* 44 Mo. App., 498; *Lee* v. *Bowen,* 5 Biss. U. S., 154; *Emery* v. *Irving National Bank,* 25 Ohio St., 360; *Halsey* v. *Warden,* 25 Kan., 128; *First National Bank* v. *Dearborn,* 115 Mass., 219; *Fifth National Bank* v. *Bayley,* 115 Mass., 228; *Conrad* v. *Allen Ins. Co.,* 1 Peters, 445.

WHITFIELD, C. J., delivered the opinion of the court.

This case falls within *Miller* v. *Bank,* 76 Miss., 84 (23 So., 439), which is in accord with and supported by *Landa* v. *Lattin,* 19 Tex. Civ. App., 246 (46 S. W., 48); *Bank* v. *White,* 65 Mo. App., 679, and *Finch* v. *Gregg,* 126 N. C., 176; 35 S. E., 251; 49 L. R. A., 679. We especially refer to the reasoning in *Landa* v. *Lattin* as thoroughly sound. There are cases to the contrary of our view, but they clearly fail to apprehend the true nature of this sort of transaction. The bank buying the draft and bill of lading is bound to comply with all the terms of the contract between seller and buyer. It is placed, as to the buyer, in the exact situation in which its assignor stood. We quote, to adopt, the following from the Texas court of civil appeals:

"The banks know that shipments of this character are seldom made without some understanding between the original assignor and the original assignee (the person to be notified). . . . The real inquiry is as to what effect should be given to this transaction, so far as it related to the rights of appellant, Landa, under the contract between him and Lattin Bros. The correct rule concerning the rights of a purchaser or an

assignee by the transfer of a bill of lading, and the quasi quality of negotiability of such instruments, is thus stated in the fourth volume of the second edition of the Am. & Eng. Enc. Law (page 549), where it is said: 'While the transfer of bills of lading may pass the title to the goods, unless the common law has been modified by statute, these instruments are not negotiable, in the sense in which that term is applied to bills and notes and other negotiable instruments of a like character. Although it has sometimes been said that a bill of lading is negotiable, nothing more is meant by this than that the transfer of the bill of lading passes to the transferee the title of the transferor to the goods described therein. Negotiability may be predicated of bills of exchange and promissory notes because they are representatives of money, which is itself negotiable to the extent that it cannot be reclaimed from any one who receives it in good faith, for value. On the other hand, bills of lading do not stand as representatives of money, but of the goods therein described, and as chattels are not negotiable, that quality cannot be given to the symbol; no greater effect can be given to the transfer of the symbol than to that of the thing which it represents. The transfer of a bill of lading, then, by the person in possession of the instrument, can give no higher title than would the transfer of the property itself by the same person. Hence it may be stated as a general rule that, where bills of lading are made negotiable by statute, the holder of a bill of lading, in the absence of either title to the goods or authority to transfer them in himself, cannot, by a transfer of the instrument, pass the right of property in the goods, even to a bona fide purchaser for value; he can convey no greater rights than he himself has.' The supreme court, in support of the text, in the case of *Shaw* v. *Bank*, 101 U. S., 557-564 (25 L. Ed., 892, 894), says: 'The function of that instrument (bill of lading) is entirely different from that of a bill or note. It is not a representative of money used for transmission of money or for the payment of debts or for

purchases. It does not pass from hand to hand as bank notes or coin. It is a contract for the performance of a certain duty. True, it is a symbol of ownership of the goods covered by it, representative of those goods. . . . Bills of lading are regarded as so much cotton, grain, iron, or other articles of merchandise. The merchandise is very often sold or pledged by the transfer of the bills which cover it. They are, in commerce, a very different thing from bills of exchange and promissory notes, answering a different purpose, and performing different functions. It cannot be, therefore, that the statute which made them negotiable by endorsement and delivery or negotiable in the same manner as bills of exchange and promissory notes are negotiable, intended to change totally their character, putting them in all respects on the footing of instruments which are the representatives of money, and charge the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes. Some of these consequences would be very strange, if not impossible; such as the liability of indorsers, the duty of demand *ad diem,* notice of nondelivery by the carrier, etc., or the loss of the owner's property by the fraudulent assignment of a thief.' . . . But a different principle, we think, governs this case. Here, the First National Bank of Hutchison purchased from the consignor, before delivery to the appellant, the wheat in question, and knew at the time that the wheat was not paid for by the appellant, and undertook to deliver the same to him, and in effect carry out the contract which had been entered into between the appellant and Lattin Bros. The Hutchison bank, as the purchaser from Lattin Bros., the original consignors, acquired against Landa no greater right in the property or shipment than that possessed by the vendors of the bank, and, between the latter and the consignors, it is charged with the same defense that could be urged where the contract was sought to be enforced between these parties.

"Now, the bank, when, by a transfer of the bills of lading

to it by Lattin Bros., it acquired the right to the property they represented, could enforce against the purchaser thereof no greater right than that possessed by its vendors. It acquired title to the property in its then condition, and, if it was wheat of a damaged or defective quality, the fact that it supposed that it was worth the amount of money paid therefor to Lattin Bros. did not convert it into wheat of a superior quality, nor authorize them to demand from Landa, upon a tender of the wheat, payment of the full sum it was out by the transaction. When the bank purchased the wheat, it was substituted to the same rights, and no more, possessed by the vendors to enforce against Landa the contract entered into between him and Lattin Bros.; and, if it had sought to enforce the contract by action, it could only do so charged with its burdens, and Landa could have in defense asserted any breach thereof that he could have urged against Lattin Bros. The bank in this case reaped the benefit of the contract in this: that, upon presentation to Landa of the bills of lading, it received the full amount due under the contract for a shipment of sound wheat. Landa, before payment, did not have an opportunity to inspect the wheat, and only discovered its damaged condition thereafter. The bank, in this way electing to reap the benefit of the contract existing between Lattin Bros. and appellant, became bound by it; and as it was the owner of the wheat, and undertook to carry out the contract, it assumed the same position in relation to the transaction as its vendors. It enjoyed no greater rights, and occupied its position charged with the demands that could have been urged against its vendors for a breach of the contract. The facts, beyond dispute, show clearly that there was a breach of the contract. Lattin Bros. and the Hutchison Bank, which succeeded to their rights under the contract, delivered to the appellant wheat in a damaged condition when the contract called for sound wheat, and the bank received therefor payment for sound wheat. This presents a clear case of breach of warranty as to the quality of the article purchased; and because

the bank, in purchasing from Lattin Bros., may not have known of the inferior quality of the article purchased, would not, in its undertaking to perform the contract with Landa, justify it in imposing upon Landa wheat of a quality different from that called for in the contract. The court in the case of *National Bank of Commerce* v. *Merchants' National Bank,* 91 U. S., 98, 23 L. Ed., 208, says: 'That the holder of a bill of lading, who has become such by indorsement, and by discounting the draft drawn against the consigned property, succeeds to the situation of the shipper, is not to be doubted. He has the same right to demand acceptance of the accompanying bill and no more. If the shipper cannot require acceptance of the draft without surrendering the bill of lading, neither can the holder. Bills of lading, though transferable by indorsement, are only quasi negotiable. 1 Pars. Shipping, 192; *Blanchard* v. *Page,* 8 Gray, 297. The indorser does not acquire a right to change the agreement between the shipper, which was not in the power of the drawer and consignor.' *Bank* v. *White,* 65 Mo. App., 697, was a case where a manufacturer of lumber and shingles sold and shipped to a dealer a carload of shingles, and at the same time drew a draft on the purchaser, with a bill of lading attached, and assigned the same to plaintiff, the banking company. When the shingles arrived, they were found to be of inferior quality, and the purchaser, the defendant, refused to pay the draft. Thereupon, the bank sued him for the entire amount of the draft. The purchaser interposed his defense; and, from the brief of appellant in the report of the case, it appears that the bank contended that it acquired the bill of lading, and became the purchaser of the shingles, in the due course of trade, for a valuable consideration, unaffected by the contract under which they were purchased by the defendant. The court, in supporting the contention of the defendant, says: 'We can discover no prejudicial error in the trial of this case; since, too, substantial justice has been done, the judgment will not be disturbed. Plaintiff's counsel are right in the con-

tention that when the bank took an assignment of the draft and bill of lading from the lumber company—whether as an absolute purchase or as collateral security—it became vested with the title of the property. From that time on, plaintiff occupied the same relation toward the shingles then in transit that the lumber company did before the bill of lading was transferred. The assignment of the bill of lading operated as a symbolical delivery of the property covered by it. However, the rights of White, the consignee, were not impaired or disturbed by the change of ownership in the property. He was left with the same defense as against the plaintiff bank that he would have against the lumber company.'

"Now, from these views, the conclusion is reached that the First National Bank of Hutchison, in becoming the owner of the wheat and undertaking to deliver it to Landa, became responsible for the performance of the contract which had been entered into between the latter and Lattin Bros. They could not by delivery of the wheat, and electing to reap the benefits of that contract, and demanding the payment of the sum called for, and receiving the same, take the position that they were not parties to the contract between appellant and Lattin Bros., and that in acquiring title to the wheat they became purchasers thereof unaffected by the burdens of the contract. The facts and circumstances show that the bank undertook its performance, and, such being the case, they had no greater rights against Landa than were possessed by Lattin Bros. The injury to the appellant is in part traceable to the conduct of the bank in delivering to the appellant, and exacting payment therefor, wheat of a damaged and defective quality; and, upon a discovery of the defective quality of the wheat by Landa, a cause of action arose in his behalf against the bank, to recover from it the damages he had sustained by reason of the wrong imposed upon him in delivering to him, and exacting from him payment for, damaged wheat. . . . The inconvenience to which banks may be put, in the manner in which commercial

transactions with its customers may be affected, by the rule announced in this opinion, is a question with which we are very little concerned, as we apprehend that the principles of law that would apply to individuals in dealing in transactions of this character would also apply to banks in dealing with their customers. The appellees, on this branch of the case, in their brief, say: 'If the banker had to examine the contract between the original shippers and purchaser of the goods, to see and know its terms, and then examine the cargo, to see if it complied with the terms of the original contracting parties, upon penalty of being held liable for some real or imagined defect therein, we fancy that there would be very little business of this kind carried on by the banks.' The diligence required of banks in their efforts to protect themselves for the money advanced to their customers should extend to an inquiry as to the value of the articles upon which they make their advances. It was a matter of slight inconvenience to this bank to have made investigations as to the quality of the wheat which it purchased from Lattin Bros., and as to the terms of the contract between Lattin Bros. and appellant. It could not, by relaxing diligence in this respect in the purchase of wheat in a damaged condition, by paying therefor a price for sound wheat, impose its want of caution on another by exacting from him payment for sound wheat. Landa was only responsible for the character of the wheat which was actually delivered to him; and this was of an inferior quality and in a damaged condition. The bank, because it was imposed upon by Lattin Bros., would not have the right to likewise impose upon Landa. The duty of the bank to exercise diligence to protect and guard its interests in a transaction of this character is as great as would be the case in a bank advancing or loaning money upon a security offered by a borrower. Except in cases of the purchase of negotiable paper, or advancing money upon paper of that character, a bank, or any one else advancing money upon a contract which its customer may have with another party, would

be put upon inquiry to ascertain the terms of that contract and the extent of the right of its customer thereunder; and the bank, in dealing with one claiming under such a contract, and as to the articles it represents, could not, because it was ignorant of its true terms and the rights of the other party, enlarge the responsibility of that party, and impose upon him a liability different from that called for in the contract."

We think the courts which have taken the other view have dealt with half the transaction—not the whole of it. They have looked to the draft, not to the bill of lading. They have failed to give every factor in the transaction its full significance, and to look through form to substance.

This is no attachment against a national bank, in any proper legal view. The case is in chancery. All the parties are before the court for the adjustment of all the equities. The national bank is a mere claimant of the fund; intervening as such claimant, and preferring its claim. Being in equity, the equities can all be adjusted, and the rights of all parties protected. It is a misconception to say that the national bank is in this proceeding attached, within the meaning of the United States statute relied on.

*Reversed and remanded.*