R. E. AND C. E. MASON v. A. E. NELSON COTTON COMPANY AND
W. A. TRICE ET AL.

(Filed 21 October, 1908.)

1. Negotiable Instruments—Consignor and Consignee—Draft, Bill of
   Lading Attached — Holder in Due Course — Original Contract,
   Liability of Holder on.

   One who has discounted a draft in due course, made for the
   purchase price of goods, with bill of lading attached, and as-
   signed to him as security to the draft, is not liable on that ac-
   count for a breach of warranty in a contract between the con-
   signor and consignee respecting the quality of the goods, the sub-
   ject of the bill of lading.

2. Same—Rights of Holder in Due Course—Strangers—Notice.

   By discounting a draft with bill of lading attached, and as-
   signed as security, the holder has an interest in the goods, the
   subject of the bill of lading, only to the extent sufficient to pro-
   tect his claim; and when the consignee accepts and pays the
   draft and receives the goods from the carrier on presentation
   of the bill of lading, without being permitted by the carrier to
   examine them, he does so in recognition of the holder's rights,
   and the holder is not liable upon a breach of warranty of con-
   tract between the original parties, to which he was a stranger,
   in the absence of evidence that he had notice thereof.

3. Negotiable Instruments—Drafts, Acceptance of—Rights of Holder
   in Due Course—Contracts—Consignor and Consignee.

   After a draft for the purchase price of goods, with bill of
   lading attached, has been accepted by the drawee, the amount
   previously paid therefor by a holder in due course becomes a new
   and binding consideration, giving such holder a position superior
   to the original contract rights between the consignor and con-
   signee, and to any defenses existent between them.

4. Stare Decisis—Rule of Property—Uniformity of Decisions—Com-
   mercial Law.

   While the doctrine of *stare decisis* is one of recognized value
   in all countries whose jurisprudence, like our own, is founded so
   largely on precedents, and the courts will adhere to a decision,
   found to be erroneous, when it has been acquiesced in for so
   great a length of time as to become accepted law, constituting a
   rule of property, it should not be extended and applied to a
   decision which is clearly erroneous and which injuriously affects
   a general business law.

MASON *v.* COTTON CO.

**5. Same—Decision Overruled—Retrospective ·Effect.**

A decision of a court of supreme jurisdiction overruling a former decision is as a rule retrospective in its operation, and the effect is not that the former decision is bad law, but that it never was law; and this principle should apply to an erroneous decision on general mercantile law which is contrary to accepted doctrine and recognized business methods.

CLARK, C. J., dissenting *arguendo.*

ACTION heard on demurrer to complaint, before *Ward, J.,* at Fall Term, 1907, of.MECKLENBURG.

The facts stated in the complaint, considered material to a proper understanding of the cause, are:

1. That in August, 1906, defendant A. E. Nelson, doing a cotton business in Texas, contracted to sell and deliver to plaintiff, resident and doing business in Charlotte, N. C., fifty bales of cotton, at the price of 8¾ cents per pound, and guaranteed that said cotton, in grade, texture and quality, was according to samples exhibited.

2. That on 6 August, 1906, the said defendant A. E. Nelson, in pursuance of said contract, delivered at Houston, Tex., fifty bales of cotton, marked "L. O. N. G.," to the Texas and New Orleans Railroad Company, a common carrier, and took and received from said railroad company a bill of lading therefor in the usual form, stipulating that said cotton was deliverable to the order of the said A. E. Nelson at Charlotte, N. C:, with instruction to notify plaintiffs, R. E. and C. E. Mason, upon its arrival at said point; and thereafter, upon the same day, the said Nelson drew his draft for the said sum of $2,176.14, the price agreed to be paid for the said cotton, upon the plaintiffs, payable to the order of one W. A. Trice, and attached to the said draft, as security for the payment of same, the aforesaid bill of lading, and thereupon endorsed the said bill of lading, and sold, assigned and transferred the same to the defendant Trice for full value, and the said Trice thereby became the owner of the cotton described in and covered by said bill of lading.

6. That thereafter the said Trice endorsed the said draft and bill of lading to T. W. House, banker, of Houston, Tex., for collection, who forwarded the same to the First National Bank of Charlotte, N. C., for a like purpose.

7. That plaintiffs were unable to get said cotton from the railroad company, when it arrived in Charlotte, without presenting the bill of lading therefor, and plaintiffs were compelled to pay said draft before they could get said bill of lading and examine said cotton to ascertain whether or not said cotton was of the same grade, texture and type contracted for; and plaintiffs, relying on the representations and guarantee of said A. E. Nelson that said cotton was of the same grade and type as the "E. V. A." samples, paid said draft to the First National Bank of Charlotte, N. C., to-wit, $2,176.14, and took up and surrendered the bill of lading to the Southern Railway Company and took into their possession the said fifty bales of cotton.

8. That immediately or as soon thereafter as practicable plaintiffs examined said cotton and found that said cotton was not of the same grade as the "E. V. A." samples, in type or texture; on the contrary, said cotton was much inferior to said samples, in grade and texture and type, and was what is known as threshed cotton, worth in the market a little more than one-half the value of cotton of the grade and texture of said "E. V. A." samples, although said defendant A. E. Nelson had represented and guaranteed to plaintiffs that said fifty bales should be the same grade, type and texture as said "E. V. A." samples.

9. That by reason of the low grade and texture and inferior quality of said cotton, plaintiffs were compelled to sell said cotton at a great loss, and were put to great expense in storing and reselling said cotton.

10. That by reason of the failure of said cotton to be of the same grade, texture and type as the "E. V. A." samples, as defendant A. E. Nelson represented, warranted and

guaranteed it to be, and by reason of the breach of the warranty and the expense incurred by reason of such breach, and failure of said cotton to come up to the grade, texture and type of the "E. V. A." samples, plaintiffs have been damaged in the sum of $1,795.62.

11. That plaintiffs are informed and believe, and are so advised, that by reason of the assignment of said bill of lading by the endorsement of said A. E. Nelson to W. A. Trice, and the endorsement of said draft by said W. A. Trice, and the assignment of said draft and bill of lading to said House, and by the endorsement of said draft and bill of lading by said House, banker (unincorporated), and the payment of same by these plaintiffs, said W. A. Trice became liable to plaintiffs for all damages they have sustained by reason of the failure of said cotton to come up to the grade, texture, and type guaranteed to plaintiffs by said A. E. Nelson, as hereinbefore set out.

12. That plaintiffs have demanded payment from the defendants, and payment has been refused.

Defendant W. A. Trice demurred to said complaint, for "that same does not set" forth any fact whereby this defendant became liable to the plaintiffs, and it appears in and by said complaint that said W. A. Trice is in no way liable to account for the alleged breach of contract set out against his said codefendants.

There was judgment overruling the demurrer and allowing said defendant to answer over, whereupon he excepted and appealed.

*Burwell & Cansler* and *W. F. Harding* for plaintiffs.
*Tillett & Guthrie* and *W. A. Trice* for defendants.

HOKE, J., after stating the case: In the case of *Finch v. Gregg*, reported in 126 N. C., 176, this Court held in effect that when a purchaser and consignee of goods has accepted and paid a draft drawn on himself by the consignor for the

purchase price to a holder of the draft, "in due course," said holder, having taken an assignment of the bill of lading, attached or otherwise, as security for the amount paid in obtaining the draft, and this bill of lading is turned over to the consignee on the payment of the draft, who thereby obtains possession of the goods, the said consignee can recover of the holder receiving such payment damages for breach of warranty given by the consignor in the original contract of sale; and this, though the holder of the draft had no interest *ultra* in the goods and took no part in the bargain. The present writer, who presided at the trial of *Finch v. Gregg* in the Superior Court, first made this ruling in the court below, following with much hesitation a decision of the Texas Court of Civil Appeals, then recently made (*Landa v. Lattin Bros.*, 19 Texas Civil Appeals, 246), and the position was sustained on appeal. The purport of this Texas decision, cited with approval in the opinion of our Supreme Court, on the question chiefly considered here is thus stated in Southwestern Reporter, Vol. 46, p. 48:

"1. A consignor of wheat delivered to a bank a bill of lading, with draft, drawn upon his consignee, attached. The bank cashed the draft and paid the consignor. The consignor had contracted to furnish sound wheat, but the wheat furnished was of inferior quality: *Held*, that the bank purchasing the bill of lading became the owner of the wheat and was responsible to the consignee for the failure to furnish sound wheat.

"3. A bank cashing a draft attached to a bill of lading drawn on the consignee of goods becomes a purchaser of the goods, and must at its peril exercise care to see that the goods are of the quality that the consignor contracted to furnish."

These cases, and the principle upon which they are made to rest, apply to the facts presented here, and if they are to be regarded as the law governing the rights of these parties the judgment of the Court below overruling the demurrer

must be affirmed. Trice, the appellant who demurred to the complaint, was the holder of the draft, in due course, with a bill of lading attached and assigned to him as security for the amount paid in discounting the draft. So far as appears, he had no interest in the goods, except what belonged to him by reason of these papers, took no part in the bargain and sale and had no knowledge or notice of its terms, and he is sued by the consignee, who accepted and paid the draft, for breach of warranty given by the consignor to the consignee in the contract of sale. After giving the question our best consideration, with a due sense of the great importance of adhering to decisions when formally announced as law by the Court, we feel constrained to overrule the case of *Finch v. Gregg,* being of opinion that the decision is based on an erroneous principle, or rather on the erroneous and unwarranted extension and application of an admitted principle, and is contrary to the great weight of well-considered authority. The case excited much comment at the time it was announced, was the subject of adverse criticism in a learned and intelligent note by the editor of L. R. A., in Vol. 49, p. 679, and the principle upon which it was made to rest was likewise condemned in a well-considered and instructive note to the case of *Hall v. Keller,* 91 Am. St. Rep., p. 209, the case being taken from 64 Kansas, 211. Another comment of like purport will be found in a note to an Alabama case of *Haas v. The Citizens Bank of Dyersburg,* 6 L. R. A. (U. S.), 242, citing additional authorities in support of the editor's position.

The opinion in *Finch v. Gregg,* delivered by our Supreme Court at February Term, 1900, was referred to at the same term in *Sloan v. Railroad,* 126 N. C., 487, as announcing a correct principle of law, and again at Fall Term, 1902, in the case of *Perry v. Bank,* 131 N. C., 117; in this last case only to say that it had no application to the cause then being

148—32

considered; and with these two exceptions, so far as the writer can discover, no other reference was made to the case until Fall Term, 1903, in *Manufacturing Co. v. Tierney,* 133 N. C., 630, when it was cited in the opinion in support of this principle: "It is well settled that when the vendor of goods ships them, taking from the carrier a bill of lading to deliver to his own order, and thereupon draws a draft payable to his own order upon the vendee, attaching the bill of lading, and endorses to a third party such draft for value, the title to the goods vests in the endorsee, at least to the extent of the amount advanced. Daniel on Neg. Instruments, sec. 1734 (a). The law is thus stated and cited with approval by Mr. Daniel: 'When the vendor of goods consigns them to the purchaser, taking a bill of lading from the carrier and intending to resume the right of control over them, at the same time drawing upon the purchaser for the price and delivering the bill of exchange, with the bill of lading attached, to an endorsee for a valuable consideration, the consignee, upon receipt of the goods, takes them subject to the rights of the holder of the bill of lading to demand payment of the bill of exchange, and cannot retain the price of the goods on account of a debt due to him from the consignor.' *Emery v. Irving Bank,* 25 Ohio St., 360; 18 Am. Rep., 299; *Bows v. Ex. Bank,* 91 U. S., 618. This Court, in *Finch v. Gregg,* 126 N. C., 176 (49 L. R. A., 679), recognized this almost elementary principle, carrying it to its fullest extent."

To the extent indicated in this citation from *Manufacturing Co. v. Tierney* the principle contained in *Finch v. Gregg* is sound. The holder of a draft or bill of exchange, who takes an attached bill of lading by assignment or otherwise as security for the amount advanced on the draft, does become the owner of the goods as against the acceptor to an extent sufficient to secure and protect his claim. And it is in extending this wholesome and very generally accepted principle of mercantile law to an unwarranted length that the error in

*Finch v. Gregg* consists. That decision not only makes the holder of a negotiable instrument, who has taken an assignment of the bill of lading only as security, the owner outright of the goods, but imposes on him the burden and obligation of a contract concerning the property made between the consignor and consignee in which the holder took no part and of which he had no notice. And in no aspect of the matter, as we view it, can such a position be sustained. Since the noted case of *Lickbarrow v. Mason,* Smith's Leading Cases, 9 Am. Ed., p. 1045, and before that time it has been accepted doctrine that the holder of a bill of lading by assignment will under certain conditions be regarded as the absolute owner of the goods; but, as pointed out by the American Annotator of this decision in Law Library Ed., Vol. 43, p. 543, this is only true when by the terms of the contract between the assignor and the assignee the entire title was to pass to the assignee. That decision was made on a question not at all relevant to this inquiry, and is therefore not further pursued; but there is nothing in the case or the principle therein announced which prevents the assignee, when the contract so provides, from taking a restricted interest under such an assignment, and of having his rights protected and enforced according to the stipulations of his contract. And, so far as we can discover, until these decisions were made which we are now reviewing, it was a doctrine universally recognized that the holder of a negotiable instrument with bill of lading attached, under the circumstances indicated, was by right superior to that of a consignee who had accepted and paid a draft drawn on him for the purchase price of the goods; and whether such consignee accepted and paid, as in this case, or paid the draft on presentation, as in *Finch's case,* the result was the same. In either event the consignee thereby took a position in recognition of the holder's rights under his contract, whatever they were.

In accordance with this doctrine, the case of *Manufacturing Co. v. Tierney, supra,* correctly holds: "4. Where a bank, for a valuable consideration, takes an assignment of a bill of lading with draft attached, the consignee of the goods takes them subject to the rights of the holder of the bill of lading for the amount of the draft, and he cannot retain the price of the goods on account of a debt due him from the consignor."

This principle is entirely inconsistent with the doctrine announced in *Finch v. Gregg,* and, as stated, is in accord with the general current of authority on the question in this country and in England. *Robinson & Cherry v. Reynolds,* 42 E. C. L., 634; *Hoffman & Co. v. Bank,* 79 U. S., 181; *Goltz v. Bank,* 119 U. S., 551; *Blaidsell v. Bank,* 96 Tex., 626; *Arpin v. Owens,* 140 Mass., 144; *Tolerton & Stetson Co. v. Bank,* 108 Iowa, 217 (50 L. R. A., 777); *Lewis v. Small Co. et al.,* 117 Tenn., 153 (6 L. R. A., N. S., 887); *Hall v. Keller,* 64 Kan., 211 (91 Am. St. R., 209), with a large number of additional authorities applying the same principle cited in the notes above referred to. *Finch v. Gregg,* 49 L. R. A., 679; *Tolerton's case,* 50 L. R. A., 777; *Haas' case,* 1 L. R. A., N. S., 242; *Hall's case, supra,* 91 Am. St. R., 209.

In *Robinson's case, supra, Tindal, C. J.,* for the Court, said: "The sole ground on which the defendant relies is that the acceptance was not binding on account of the total failure or insufficiency of the consideration for which it was given, the document on the delivery of which the acceptance was given having been forged and there never having been any other consideration whatsoever for the acceptance of the defendants. And this would have been a good answer to the action if the bank had been the drawer of the bill. But the bank is endorsee, and endorsee for value, and the failure or want of consideration between it and the acceptors constitutes no defense, nor would the want of consideration between the drawer and acceptors (which must be considered as

included in the general averment that there was no considera-
tion), unless they took the bill with notice of the want of con-
sideration, which is not averred in this plea."

The exact case is presented in *Tolerton's case, supra,* where
it is held: "(1) The purchaser of a draft with bill of lading
attached is not liable on a warranty made by his assignor of
the goods represented by the bill of lading. (2) Payment by
the drawee to the payee of a negotiable draft with bill of
lading attached cannot be recovered back by the drawee on the
ground that the payee has received money which it cannot
equitably retain because of a breach of warranty made by the
drawer to the drawee on the sale of the goods for which the
bill of lading was given, since any equities arising therefrom
do not affect the payee when he has secured an acceptance or
payment."

In *Hoffman's case, supra,* it was held: "A consignor who
had been in the habit of drawing bills of exchange on his con-
signee with bills of lading attached to the drafts drawn (it
being part of the agreement between the parties that such bills
should always attend the drafts), drew bills on him with
forged bills of lading attached to the drafts, and had the
drafts with the forged bills of lading so attached discounted
in the ordinary course of business by a bank ignorant of
the fraud. The consignee, not knowing of the forgery of
the bills of lading, paid the drafts: *Held,* that there was no
recourse by the consignee against the bank."

And the doctrine, and the reason upon which it rests, is
well stated in the opinion, as follows: "Proof, therefore,
that the bills of lading were forgeries could not operate to
discharge the liability of the plaintiffs, as acceptors, to pay
the amounts to the payee or their indorsees, as the payees
were innocent holders, having paid value for the same in
the usual course of business. Different rules apply between
the immediate parties to a bill of exchange, as between the
drawer and the acceptor, or between the payee and the

drawer, as the only consideration as between those parties is that which moves from the plaintiff to the defendant; and the rule is, if that consideration fails, proof of the fact is a good defense to the action. But the rule is otherwise between the remote parties to the bill, as, for example, between the payee and the acceptor or between the indorsee and the acceptor, as two distinct considerations come in question in every such case where the payee or indorsee became the holder of the bill before it was overdue, and without any knowledge of the facts and circumstances which impeach the title as between the immediate parties to the instrument. Those two considerations are as follows: First, that which the defendant received for his liability, and, secondly, that which the plaintiff gave for his title; and the rule is well settled that the action between the remote parties to the bill will not be defeated unless there be an absence or failure of both these considerations. Unless both considerations fail in a suit by the payee against the acceptor, it is clear that the action may be maintained, and many decided cases affirm the rule, where, if any intermediate holder between the defendant and the plaintiff gave value for the bill, such an intervening consideration will sustain the title of the plaintiff."

The opposing principle that maintained in *Finch v. Gregg* is not only contrary to this great array of well-considered authority, but is against the real facts of the transaction, bringing the holder of a negotiable instrument under the burdens of a contract which he never made, and in which, so far as appears, he had no interest. The allegations in the complaint, made by the plaintiff himself and admitted by the demurrer, are to the effect that one Nelson, of the Nelson Cotton Company, sold the cotton to plaintiff. He or one of them owned the cotton, made the bargain, gave the warranty and got all the profits, if there were any.

Trice, the defendant and payee, took the draft for full value in the regular course of mercantile dealing, and, as heretobefore stated, so far as the facts show, he had no interest in the cotton, took no part whatever in the bargain and had no knowledge or notice of its terms.    He simply received what was due him under his contract, and, this being true, it would be a hard measure of justice to hold him responsible for the assurances and stipulations given by the vendor to the purchaser in the contract between them from which he derived no benefit.    This case of *Finch v. Gregg* and the two or three others of like import profess to find support in *Dows v. Bank,* 91 U. S., 618, and *Bank v. White,* 64 Mo. Appeal Reports, p. 677, but.neither of these decisions is authority for their position.    In *Dows v. Bank* the precise question we are now discussing was not presented, but the case in its principal feature held that where a bank had discounted a draft in due course for the purchase price of certain wheat, and had taken bills of lading as security for the amount, these bills making the wheat deliverable on account of the cashier of a correspondent bank, the bank discounting the draft (holder of the same in due course) would be the owner of the wheat to the extent necessary to protect its claim, and could recover the same from one who had purchased the wheat from the drawee of the draft, to whom it had been delivered, but who had received it as warehouseman, subject to instructions not to deliver till the drafts were paid.    The drawee of the draft had neither accepted the same nor paid it on presentation, and the question was simply one of title between the bank, the holder of the draft with bill of lading attached, and the purchaser from the drawee, who had received the wheat as warehouseman, with instructions not to deliver; and the rights and obligations of the respective parties after acceptance or payment of the draft by the drawee were in no way considered.    So far as this decision bears on the question, it favors defendant's position in hold-

ing, as it does, that a person discounting a draft in due course for the purchase price of goods, and taking a bill of lading attached as security, can enforce his claim according to the terms of his contract. The case on this point being properly digested as follows: "2. A party discounting a draft and receiving therewith, deliverable to his order, a bill of lading of the goods, against which the draft was drawn, acquires a special property in them, and has a complete right to hold them as security for the acceptance and payment of the draft."

In the Missouri case, the bank having discounted a draft of a lumber company for the price of certain shingles, with bill of lading attached, and assigned to the bank as security for the amount, sued one White, a lumber dealer and drawee of the draft, to whom the shingles had been consigned for sale at a certain price. White, the consignee and defendant, had taken the shingles from the carrier, paying a freight bill thereon to the amount of $134.61, and, finding the shingles were off grade and not salable at the stipulated price, immediately notified the consignor, requesting that he take the shingles and reimburse him for the amount of his costs and charges or the shingles would be sold for that purpose. No attention being paid to this request, White sold the shingles, realizing the market value, reimbursed himself for the amount he was wrongfully out of pocket, and remitted the balance of $40 to the consignee and original owner. The bank sued for the entire amount of the draft, and the Court of Appeals, in holding that the defense was available against plaintiff's demand, said: "From that time on plaintiff occupied the same relation towards the shingles then in transit that the lumber company did before the bill of lading was transferred. The assignment of the bill of lading operated as a symbolic delivery of the property covered by it. However, the rights of White, the consignee, were not impaired or disturbed by this change of ownership in the property.

He was left with the same defense as against the plaintiff bank that he would have as against the lumber company," etc.

It will be noticed here that White, the consignee, had not accepted or paid the draft drawn on him and discounted by the bank, and this distinction serves to indicate and emphasize the error in the cases we are reviewing. Until White, the drawee, had accepted the draft or acknowledged his obligation thereon by paying the same, he was only bound by the terms of the original contract, and that was the only consideration moving against him; and the discounting bank, having to assert its demand under and by virtue of the original contract of the consignor, must take his position in the transaction and be subject to the defenses available against him. But on acceptance of the draft the owner comes under a different obligation, and the amount paid by the bank for the draft becomes a new and binding consideration, giving the bank, when a holder in due course, a position superior to the original contract between the consignor and consignee, and to any defenses existent as between them.

So far as we are now aware, the first case notably making erroneous application of these two authorities was that of *Landa v. Lattin Bros. et al.,* decided by the Texas Court of Civil Appeals, in June, 1898, and reported in 19 Tex. Civil Appeals, p. 246. That decision held, as stated, that the purchaser of goods and drawee of draft for purchase price, who pays same on presentation, may recover for breach of contract stipulations made by the vendor against one who has become the owner of the draft in due course, with bill of lading attached and assigned as security for the amount paid in obtaining the draft. A conclusion drawn from the position maintained in this and other cases holding the same view, that the holder, in taking the assignment of the bill of lading as security, becomes the owner outright of the goods and responsible for the stipulations of the bargainor given in the

original contract of sale, a position which we have endeavored to show cannot be sustained in reason or authority. The decision has since been disapproved by the Supreme Court of Texas, in an opinion delivered in June, 1903 (*Blaidsell Co. v. National Bank,* 96 Tex., 627), and is no longer recognized as authority in that State.

The Supreme Court of Mississippi has rendered a decision similar to that of *Landa v. Lattin Bros.,* in *Searles Bros. v. Smith Grain Co.,* reported in 80 Miss., 688. The opinion in this case, however, simply adopts the reasoning of the Court in *Landa v. Lattin Bros.,* embodying the opinion in that case as its own deliverance on the subject, and in itself adds nothing to the discussion and affords the position maintained no additional weight, except that which arises from the sanction and approval of that learned and usually sane and safe Court.

Another case sustaining the position announced in *Landa v. Lattin Bros.* is that of *Haas v. The Bank,* 144 Ala., 562. The decision reported also in 1 L. R. A., N. S., 242, where it is subjected to adverse comment in a note by the editor, proceeds on the theory that the holder, in taking over the draft with bill of lading attached, without proof *ultra,* thereby became the owner outright of the goods and of the contract of sale, and by delivering the bill of lading on payment of the draft he came under all the obligations of the original parties to the contract of sale. The Judge delivering the opinion states the position as follows: "And when, as here, the defendant became the owner of the debt and the goods, and assuming necessarily the responsibility and burden of delivering them to the plaintiffs, it became the seller in fact, and must bear the burden of the transaction. In short, the defendant took the contract of Klyce, the shipper, and stood in his shoes with the same rights—no greater, no less."

There is doubt if the Court intended in strictness to apply the principle stated to a case like that presented here, for in our case it is stated expressly that the appellant took the bill of "lading as security," but on the facts suggested in the opinion we do not think the decision of *Haas v. Bank* can be sustained, proceeding as it does on the assumption, without proof, that the bank on discounting the draft with bill of lading attached became the owner of the original contract of sale.

As we have held in *Furniture Co. v. Express Co.*, 144 N. C., 642, "A court will take judicial notice of the general business methods of railways and other well-known and *quasi* public corporations when these methods are universally practiced and commonly known to exist, and to the extent that such methods are sufficiently notorious to make their assumption safe and proper." And we think it an erroneous position to hold or assume that a bank, in discounting a draft for purchase price of goods, with bill of lading attached, took over or intended to take over the original contract of sale or to come under its burdens. On the contrary, we may safely assume, when there is no proof to the contrary, that no such intent existed, and that the bank simply discounted a draft according to the ordinary methods of mercantile dealing. It held it, and had a right to hold it, by reason of the consideration moving from itself to the drawer, and when the drawee accepted or paid the draft, on presentation, he did so in recognition of the bank's position.

It is earnestly contended that the appellant in the present case comes under the obligation of the contract of sale, because the plaintiff was compelled to pay the draft before he could make examination of the cotton—that he was forced to take the cotton "unsight unseen." There is doubt if any such allegation is made against the appellant. In this connection the complaint states "that plaintiffs were unable to get said cotton from the railroad company, when it arrived at

Charlotte, without presenting a bill of lading therefor, and plaintiffs were compelled to pay said draft before they could get said bill of lading and examine said cotton to ascertain," etc.

The allegation here seems to be against the carrier, and we have held in *Sloan v. Railroad,* 126 N. C., 487, that a common carrier, under certain circumstances, may permit a consignee to inspect goods without subjecting itself to liability; but if it be conceded that no such right existed here, and that the refusal was imputable to Trice, the appellant, he had the right to stand on the integrity of his own contract and hold the goods as owner till his draft was paid. As heretofore stated, by reason of the consideration moving from himself, as purchaser of the draft, his position was superior to that of the drawee, and he had the contract right to insist that the drawee should recognize this position before delivering to him the bill of lading.

Even on grounds of expediency, if such considerations should have place in a discussion of this character, the weight of the argument is against the plaintiff. The utmost that can be urged by plaintiff against the doctrine we apply in denial of his claim is that, by negotiation of the draft, at times colorable, he may be forced to seek redress for his wrong in a distant forum, and that his recovery may on occasions be restricted to a vendor who is insolvent. But these general laws of business, established to facilitate and promote enlightened commercial intercourse, are framed, and properly framed, on the assumption that men will act honestly, and as a rule they do. The few cases that are brought before the courts for decision are exceedingly small in proportion to the immense volume of business that is carried on and satisfactorily adjusted between the parties. And one of these rules universally recognized as well fitted for its purpose should not be interfered with nor have its usefulness seriously impaired because in rare and exceptional instances a wrong may be

possible. And it must be borne in mind that the plaintiff is left without interference to assert his demand against the original vendor, the man with whom he had elected to deal.

Speaking to this question, in the case of *Hall v. Keller,* 64 Kan., 211, *Smith, J.,* delivering the opinion of the Court, said: "To fix a liability upon the bank or upon Keller & Dean, under the circumstances of the present case, would not only violate well-settled rules of the law governing commercial paper, but would also tend to decrease the immense volume of business which is carried on by shippers of stock, grain and other commodities by restricting that freedom with which banks advance money to the drawers of such drafts with bills of lading attached. If banks in whose favor such bills are drawn are made liable for damages on account of the defective quality of the property shipped and covered by the bill of lading, or for failure of title in the drawer of the draft, a serious impediment would be placed in the way of shippers who need a part or all of the price of the commodity sold before its arrival in the market to which it is consigned. To hold with the plaintiff in error would, to use the language of the author of the note in *Finch v. Gregg,* 49 L. R. A., 679, 'undoubtedly cause a revolution in commercial circles.'"

We are not insensible to the great importance of the doctrine of *stare decisis,* a doctrine of recognized value in all countries whose jurisprudence, like our own, is founded so largely on precedents. We know that the courts in such countries, as a general rule, will adhere to a decision found to be erroneous, when it has been acquiesced in for a great length of time, so as to become accepted law, constituting a rule of property. And there are other conditions, restricted in their nature, where the doctrine may be properly applied, but none of them require or permit that a court should adhere to a decision, found to be clearly erroneous, which affects injuriously a general business law, and under the circumstances indicated here. As it has been well said,

"Where vital and important public or private rights are concerned, and the decisions regarding them are to have a direct and permanent influence on all future time, it becomes the duty as well as the right of the court to consider them carefully and to allow no previous error to continue, if it can be corrected. The foundation of the rule of *stare decisis* was promulgated on the ground of public policy, and it would be a grievous mistake to allow more harm than good to come from it." 26 Am. and Eng. (2d Ed.), p. 184. This decision, announced something like ten years ago, cited, not more than twice, as direct authority for the position it contains, and disapproved in the State where it seems to have originated, commented on adversely by the intelligent annotators and reviewers of the country, and pronounced unsound by the great weight of authority bearing on the question, cannot be considered to have ever been acquiesced in or to have become the accepted law of the land. Nor are we inadvertent to the fact that this contract was made at a time when *Finch v. Gregg* expressed the rule which prevailed with us on the question presented, but we are of opinion that this should not be allowed to affect the result.

The general principle is that a decision of a court of supreme jurisdiction overruling a former decision is restrospective in its operation, and the effect is not that the former decision is bad law, but that it never was the law. *Center School Township v. State ex rel.,* 150 Ind., 168; *Stockton, Trustee, v. Manufacturing Co.,* 22 N. J. Eq., 56; *Storrie v. Cortes and wife,* 90 Tex., 283. To this the courts have established the exception that where a constitutional or statute law has received a given construction by the courts of last resort, and contracts have been made and rights acquired under and in accordance with such construction, such contracts may not be invalidated nor vested rights acquired under them impaired by a change of construction made by a subsequent decision. *Hill v. Railroad,* 143 N. C., 539; *Gelpcke*

*v. City of Dubuque,* 68 U. S., 175 ; *City of Sedalia v. George A. Gold,* 91 Mo. App., 32. And there is high authority for the position that this is the only exception that should be allowed. *Falconer v. Simmons,* 51 W. Va., 172. And while this Court, in a case of unusual hardship, has extended the principle of this exception to a criminal cause, in *State v. Bell,* 136 N. C., 674—a cause it will be noted, arising on the construction of a statute—and, in another decision, to a case where a title to real estate had vested (*Hill v. Brown,* 144 N. C., 117), the principle should certainly not be further extended and applied to an erroneous decision on general mercantile law which is contrary to accepted doctrine and recognized business methods. We are of opinion, therefore, that the case of *Finch v. Gregg* should be overruled and the principle upon which it rests disapproved:

1. As contrary to the general current of authority on a subject where uniformity of decision is so greatly to be desired.

2. Because it puts an undesirable and injurious clog upon commercial intercourse between different sections of the country.

3. Because it may, and frequently does, work grievous wrong to parties litigant, in subjecting them to the burdens and obligations of contracts which they never made, and holding them responsible for fraud and wrongs which they did not commit and of which they had no knowledge or notice.

And from this it follows that the judgment overruling the demurrer of the defendant Trice should be reversed, and on the facts stated in the complaint said demurrer should be sustained.

Reversed.

CLARK, C. J., dissenting: The complaint alleges that the defendant Nelson, in Texas, contracted to sell the plaintiff fifty bales of cotton, of a certain grade and quality, at a certain price, and shipped said fifty bales to plaintiff, taking a bill of lading to deliver same to his own (Nelson's) order in Charlotte, N. C. He drew a draft upon plaintiff for the purchase price, payable to defendant Trice, attached the bill of lading thereto, and delivered them for value to said Trice, who endorsed the draft and forwarded it to his correspondent in Charlotte for collection, with instructions not to deliver the bill of lading to plaintiff till the draft was paid. Upon arrival of the cotton the plaintiff was not allowed to examine or inspect the same till the draft was paid. When plaintiff did receive the cotton, and examined it, he found that it was very inferior to the grade and quality of cotton he had contracted and paid for—so much so that he avers a loss of $1,795.62—and he brings this action to recover back said sum from Nelson and Trice. The latter demurs to the complaint, on the ground that it states no cause of action against him, and appeals from the judgment overruling the demurrer.

If Nelson had given Trice a simple draft upon the plaintiff, and the latter had paid the same, he could not have recovered anything back. It would have been his own fault. But defendant Trice was not satisfied with a draft. He took an assignment of the bill of lading, taking thus to himself the title and the possession of the cotton. He did this to secure himself. He would not permit the plaintiff to receive or even examine the cotton till he had paid the draft. He thus in effect represented to the plaintiff that the cotton was as contracted for, and worth, on the basis of the contract, the amount of the draft.

It is a bad rule that will not work both ways. If the assignee of the bill of lading acquires the title and possession to protect himself against nonpayment of the draft, the

drawee, who is not given the opportunity to examine and reject the cotton, is entitled to recover any sum he pays in excess of the contract price, if there is shortage either in the quantity or quality of the goods. This is fair and just to both sides. It gives the same protection to both. If Trice had permitted the plaintiff to examine the cotton before accepting it, there could have been no complaint. But having compelled the plaintiff to take the cotton "unsight, unseen," under risk of suit for damages if he refused, there was an, implied representation, in all fairness, that the cotton was such as was contracted for, and for the price of which Trice was paid. There should be no unjust advantage given to the payee of a draft over the drawee because the payee has an assignment of the bill of lading. If the seller had brought the cotton into town on his wagon, to deliver in accordance with a previous contract, he could not require payment until the cotton had been examined and it was ascertained that it came up to the contract, and, had he so exacted, certainly the seller would be liable for the deficiency in quantity and in quality.

When the cotton is sent by railroad instead of by wagon, and instead of the seller the holder of the bill of lading has the title and possession, and refuses to deliver unless payment is made without inspection, the relation and rights of the parties are the same.

Consignees are entitled to a "fair deal" as well as the payees of drafts secured by assignment of bills of lading. The latter has the security of title and possession of the goods. The consignees are entitled to inspection of goods before payment of draft, and if that is refused and they are forced to pay under penalty of sale or reshipment of goods and protest of the draft, then the payee of the draft is bound to make good the quality and quantity as per the contract for which the draft is drawn.

148—33

This same point was before this Court and, after able and elaborate argument, was decided as above by a unanimous Court. *Finch v. Gregg,* 126 N. C., 176. Exactly the same ruling was made in *Grocery Co. v. Bank,* 144 Ala., 562; *Searles v. Grain Co.,* 80 Miss., 688; *Landa v. Lattin,* 19 Tex. Civ. App., 246; though the last-named case has since been reversed in Texas.

In *Bank v. Bank,* 91 U. S., 98, *Mr. Justice Strong* says: "That the holder of a bill of lading, who has become such by endorsement and by discounting the draft drawn against the consigned property, *succeeds to the situation of the shipper* is not to be doubted. He has the same right to demand acceptance of the accompanying bill, and no more. If the shipper cannot require acceptance of the draft without surrendering the bill of lading, neither can the holders. Bills of lading that are transferable by endorsement are only *quasi* negotiable. The endorsee does not acquire a right to change the agreement between the shipper and his sendee. He cannot impose obligations or *deny advantages* to the drawee of the bill of exchange drawn against the shipment which were not in the power of the drawer and consignor."

*Bank v. White,* 65 Missouri App., 679, was a case where a manufacturer of lumber and shingles sold and shipped to a dealer a car load of shingles and at the same time drew a draft on the purchaser, with a bill of lading attached, and assigned the same to the plaintiff, the banking company. When the shingles arrived they were found to be of inferior quality, and the purchaser refused to pay the draft. Thereupon the bank sued the purchaser for the entire amount of the draft, and the purchaser interposed his defense. The Court, in supporting the contention of the defendant, says: "We can discover no prejudicial error in the trial of this case, and since, too, substantial justice has been done, the judgment will not be disturbed. Plaintiff's counsel are right in the contention that when the bank took an assignment of

the draft and bill of lading from the lumber company, whether as an absolute purchase or collateral security, it became vested with the title to the property. From that time on, plaintiff occupied the same relation towards the shingles then in transit that the lumber company did before the bill of lading was transferred. The assignment of the bill of lading operated as a symbolical delivery of the property covered by it. However, the rights of the consignee were not impaired or disturbed by the change of the ownership in the property. He was left with the same defense as against the bank that he would have had as against the lumber company."

In *Haas v. Bank,* 144 Ala., 562, a shipper consigned goods in his own name, having the bill of lading made out to himself, and assigned the bill, accompanied by draft on the buyer, to a bank to which the draft was made payable, and which paid the seller for the goods. In that case it was held that the bank became the absolute owner of the goods and of the debt due from the buyer, and, on constructively delivering the goods to the buyer by an assignment of a bill of lading and the acceptance and payment of the draft by the buyer, became liable to him to the same extent as the seller would have been, but for the assignment, for any shortage in the goods. On page 131 the Court said: "In short, the defendant took the contract of the shipper and stood in his shoes, with the same rights—no greater, no less; and the payment of the draft by plaintiffs, who were consignees, which merely evidence the price to be paid for the goods, could no more shield or protect the defendant bank from liability than its payment would have protected the shipper had he undertaken a delivery of the goods and received the purchase price for them. It would be an anomaly to hold that the defendant is protected as purchaser of the account and bill of lading because the plaintiffs paid the draft, which also belonged to it in right of its ownership of the goods, or that it held the bill of lading for security for a debt which belonged

to it.   Just how it could be the unqualified owner of the debt and only a qualified owner of the goods, when it purchased both, says the court, we confess our inability to see."   In almost identical language is *Searles v. Grain Co.,* 80 Miss., 688, citing and approving *Landa v. Lattin, supra; Bank v. White, supra; Finch v. Gregg, supra,* and *Miller v. Bank,* 76 Miss., 84.   In the *Searles case* plaintiffs purchased a lot of corn from the Smith Grain Company at a fixed price. Only a part of the corn was shipped, and in order to supply their customers they were compelled to go into the market and buy other corn at a higher price.   The corn shipped them was defective in quality, whereby they suffered loss. The Smith Grain Company drew on the plaintiffs for the purchase price of the corn in favor of the Exchange National Bank, and said bank paid said draft, and on other dates they bought other corn and suffered losses in the same way.   All the drafts were drawn on the same bank and paid through the same channels.   The Court, citing the cases above named, and approving them, says: "This case falls within *Miller v. Bank,* which is in accord with and supported by *Landa v. Lattin, supra; Bank v. White* and *Finch v. Gregg,"* and further says: "We specially refer to the reasoning in *Landa v. Lattin* as thorough and sound.   There are cases to the contrary of our views," says the Court, "but they clearly fail to apprehend the true nature of this sort of transaction.   The bank buying the draft and bill of lading is bound to comply with all the terms of the contract between seller and buyer. This places it, as to the buyer, in the exact situation in which its assignor stood."   On page 290 the Court says: "We think the courts which have taken the other view have dealt with half the transaction—not the whole of it.   They have looked to the draft—not to the bill of lading.   They have failed to give every factor in the transaction its full significance and to look through form to substance."

Assignments of bills of lading are not governed by the commercial law. The transferee simply acquires the title of transferer to the goods described in them. *Williams v. Railroad,* 93 N. C., 42; *Haas v. Bank,* 144 Ala., 562; *Bank v. Hurt,* 99 Ala., 130 (19 L. R. A., 701; 42 Am. St., 38); *Trust Co. v. Railroad,* 99 Ala., 416 (42 Am. St., 75; 4 Am. and Eng. Enc., 2d Ed., 549).

By the assignment of this bill of lading to Trice he became the owner of the property. *Dowe v. Bank,* 91 U. S., 618; Daniel Neg. Instr., sec. 1734a. By the endorsement of the draft to him he became the owner of the right to receive the purchase money evidenced by the draft.

On arrival of the cotton the plaintiff had the right, if it was short either in quality or quantity, either to refuse it or, if he received it and was sued for the price, to have set up the loss by reason of such defects. *Kesler v. Miller,* 119 N. C., 475; *McKinnon v. Morrison,* 104 N. C., 354. In common justice, the consignee should be allowed to see the goods before paying or refusing to pay the draft. The rights of Trice, assignee of the bill of lading, are not greater than those of Nelson, assignor. If Trice had sued consignee and drawee for refusal to pay draft and accept goods, he could recover no more than their value on the contract basis. He cannot put himself on a higher plans by compelling the purchaser to take them without opportunity of inspection, and thus, having collected more than their contract value, refuse to be liable in an action by the purchaser to recover back the excess sum thus extorted. *Finch v. Gregg* has been reaffirmed by *Sloan v. Railroad,* 126 N. C., 489; *Manufacturing Co. v. Tierney (Connor, J.),* 133 N. C., 636, and has been cited and followed in other States, *ut supra.*

The bill of lading is a security to the holder of the draft attached thereto that he shall receive the purchase price before he surrenders possession of the property, but it does not protect him from refunding, if by refusal of opportunity to

inspect he collects the full purchase price when the goods upon delivery are found to be below the contract.

Such cases as this could not possibly occur if the consignee was permitted to inspect the goods before paying the draft. The assignee takes the draft and bill of lading, relying on drawer and the goods. He should have no more. If there is a defect in quality or quantity, the holder of the draft and bill of lading should look to the party from whom he bought them to make good, and not, having forced payment out of the consignee and drawee by refusing sight of the goods, refuse reimbursement. This is not fair.

A bill of lading has not the characteristics of negotiable paper, and it should not have. A bill of lading is not good against the company that issues it, even in favor of a *bona fide* holder for value, unless goods of the quality and quantity described therein are actually delivered to it. *Williams v. Railroad,* 93 N. C., 42. Certainly, therefore, it should not be conclusive against the consignee, unless he is afforded an opportunity to examine the shipment as to quantity and quality before accepting or paying a draft attached to the bill of lading. The rule should not be more rigid against the drawee than the holder can enforce it against the railroad or other common carrier.

The rule in this State, allowing the drawee to inspect goods before accepting the draft, thus making the drawee liable for no more than the carrier would be ·if there was no delivery, *i. e.,* only for goods of the quantity and quality actually delivered, was held the law in this State nearly ten years ago by one of the best and ablest judges on the Superior Court bench, and on appeal he was affirmed by a unanimous Court. *Finch v. Gregg,* 126 N. C., 176. It has ever since been recognized as law here. Parties, including those to this action, are presumed to have dealt with each other, relying upon that ruling being the law. It has worked no hardship. Its revocation will unquestionably protect the vendor and ship-

per in this case in a fraud he has perpetrated, and will deprive consignees of the just protection they have had. Why, then, change it? For what purpose?

*Finch v. Gregg* has not only been held law in this State for many years, and not denied till now, but our decision has been cited and followed in other States, as above quoted, as well as in our own Court. *Finch v. Gregg* is a just decision, protecting the consignee here against fraud by vendors in distant States. It has "made for righteousness," and should stand. If courts in other States, where the interest of dealers in mercantile paper is the public policy, have specially favored them by assimilating bills of lading to the rights of negotiable paper, that is no reason why we should abandon our own decisions to follow theirs. We did not abandon our doctrine of mental anguish because the courts in some other States, where the claim of telegraph companies to exemption from liability was more favored, held to the contrary.

It has been suggested that vendees of goods shipped here can, by special contract in each case secure the right to examine the goods before accepting or paying the draft. But why change our decisions to require a special contract? Besides, such contract, if conceded, by the vendor, would not be put by railroads in the bills of lading, and it could not be put into the draft without affecting its negotiability; and hence the holder, having no notice, would be exempt, and the opportunity of vendors to commit the same fraud as the vendor in this case, both in the quality and quantity of shipments, will be unrestricted.

There are 380 cotton mills within 100 miles of Charlotte, N. C., and the number is increasing and will largely increase. The adjacent territory is growing more and more incapable of furnishing a full supply of cotton, and it must be shipped in ever-increasing quantities from distant points. Under the just and honest rule laid down in *Finch v. Gregg,* and followed for so many years in this and other States, above cited, the assignee of a draft looks to the drawer till ac-

ceptance, and until then the bill of lading is good against the vendee only to the extent that the quality and quantity of the goods come up to the contract, with the necessary corollary that the consignee can always examine the goods before he assumes unqualified liability by accepting the draft. It is a serious matter to affect our great and growing manufacturing interests by changing the law as we have so held it to be—a law which has protected the consignee, without any possibility of injury to any honest consignor. The holder of the draft usually receives it "for collection"; but if he buys it he should take it on faith of vendor's credit, supplemented only by value of goods. Indeed, the holder will be benefited by a rule which forces the shipper to send goods of the quality and quantity contracted for. Failure to do so will be rare when he knows the consignee has the right to see them.

The change will have a wider application than affecting injuriously our great cotton-milling industry. There are many dealers in North Carolina who buy meats, lard, corn, wheat and flour in the Northwest in large quantities to retail to their customers. These shipments are drawn for, with bills of lading to the shipper's orders attached to the draft, which is usually assigned, as in this case, "for collection." Under the law, as we have held it, without detriment, for the nearly ten years past, the vendee ran no risk, for he has till now had the right to examine the goods before accepting the draft. But if that is now changed, the vendee must assume the risk of such frauds as the vendor has perpetrated in this case, for not only a special contract could not be put into bill of lading or draft, but the vendors of these articles, like Armour, Swift and others, will not make such special contracts, well knowing that the dealers here must buy of them or not at all.

Our rule has worked well. It has protected consignees here. It has not injured any honest consignor. The revocation of the rule will deliver purchasers here into the uncovenanted mercy of distant consignors who cannot be reached by the process of our courts.