CITIZENS BANK AND TRUST COMPANY OF BELZONI *v.* HARPETH NATIONAL BANK OF FRANKLIN ET AL.

[82 South. 329, Division A. No. 20750.]

1. CARRIERS. *Bill of lading attached to draft.*

The contention that a bank purchasing a draft with bill of lading attached does not assume any of the liabilities of the seller of

the goods and is not liable on a warranty made by the seller of the goods represented by the bill of lading, cannot be sustained.

2. BANKS AND BANKING. *Power of national banks. Personal property. Statute.*

When as a consequence of a purchase of drafts with bill of lading attached, a national bank becomes the owner of personal property as an incident to the purchase of the drafts, such purchase is not prohibited by Revised Statutes, section 3136 (Comp. St., 9661).

3. INJUNCTION. *Dissolution. Sufficiency of showing.*

When upon a motion to dissolve a temporary injunction, the affidavits and pleadings show a sharply controverted question of fact, the injunction should not be dissolved on mere affidavits, but the cause should proceed to final hearing.

4. BANKS AND BANKING. *Failure to remit proceeds or drafts collected. Necessity of demand.*

Where drafts with bill of lading attached had been forwarded by the holder to another for collection, there can be no conversion by failure to promptly remit the proceeds, in the absence of a demand from the owner thereof.

APPEAL from the chancery court of Humphreys county. HON. E. N. THOMAS, Chancellor.

Action by S. Castleman against S. M. Fleming, Citizens Bank & Trust Company of Belzoni, Harpeth National Bank of Franklin and others, with cross-bill for an injunction by the Citizens Bank & Trust Company of Belzoni. From an order dissolving the temporary injunction granted cross petitioners such petitioner and others appeal.

*James M. Cashin* and *G. G. Lyell,* for appellant.

In our original brief we have said all that we care to say upon this subject, merely reiterating what is there set out at greater length, to the effect that the rule announced by our court in the Searles case, and many, many times repeatedly reaffirmed, is too firmly imbeded in our jurisprudence to be now disturbed. The

fact that on March 31, 1919, in the Mark's case, this court by a decision in Banc, reaffirmed the former adjudication, makes us feel assured that the rule will not be disturbed.

As stated in our original brief, this court will now bear in mind the marked distinction between our line of cases on that subject and those from other states. This distinction, or substantial difference, results from the enactment by our legislature of the bill of lading statute, section 4852, Code 1906, requiring a collecting bank, or other agency, to hold the proceeds of all drafts, with bills of lading attached, for ninety-six hours after the delivery of the bill of lading before remitting the proceeds.

In none of the other states, or, certainly, it does not appear in any of the adjudicated cases from other states, cited by opposite counsel in their brief, that such other states have a statute similar to ours.

This statute makes all the difference in the world in the rule that must obtain in Mississippi, even if the law as announced in the Searles case and others, would be unsound, but for the existence of said statute a thing we do not concede. The two cars of wheat were consigned to Fleming & English, notify S. Castleman. The drafts in question in the instant case were drawn by Fleming & English on S. Castleman at Belzoni, Mississippi. They were payable in Mississippi and were paid in Mississippi and the delivery of the two cars of wheat was made in Mississippi. It was a Mississippi transaction in dealing with S. Castleman were chargeable with notice of this statute, and with the legal effect of same. It was the opinion of Judge Edward Mayes that the Harpeth National Bank was estopped from contending that it was a purchaser without notice. This statute makes of every alleged purchaser, a purchaser with notice of the fact that the consignee has a right to tie up the proceeds of the draft in Mississippi, and here litigate with the con-

signor, and with any alleged owner of this draft, an action for breach of warranty, etc.

The bench and bar of Mississippi will all agree that whether there was ever any greater lawyer in Mississippi than the late Judge EAWARD MAYES, that he was at least one of the greatest lawyers of this or any other state. It was the opinion of Judge EDWARD MAYES that the contention that we are now making is sound, and that the decisions of this court in the Searles case and others and down to the Mark's case, are sound, notwithstanding the enactment in this state in 1916 of the Negotiable Instruments Act.

When that act was passed by the legislature of Mississippi, it, together with other banking and commercial statute of Mississippi, were compiled by Mr. Thomas H. Dixon, the Secretary of the Mississippi Bankers Association. Judge Edward Mayes, firm, of which the writer was then a member, were attorneys for the Mississippi Bankers Association. Mr. Dickson employed Judge Edward Mayes to prepare an ''Introductory Comment upon the Uniform Negotiable Instrument Act.'' and such comment was published by Mr. Dickson in a little volume called ''Banking and Commercial Statutes of Mississippi, 1916.''

On page 55 of said compliation will be found the comment of Judge EDWARD MAYES upon section 58 of said act. That section covering the question when a negotiable instrument is subject to original defenses.

His comment reads: ''Section 58.—This section makes the proceeds of notes and checks taken and held in due course, inviodable in the hands of a third party. See, also, section 52. But a special question arises in the case of drafts drawn through hands, with bills of lading attached. By common usage of trade, a draft, in this attitude, is subject to the question that the goods against which it is drawn may not come up in quality or quantity, and there may be a come back against the drawer. In

such case it would seem that the bank takes the proceeds of such drafts, with notice of infirmity in the same, and takes it subject to section 4852 of the Code of 1906.''

That comment was the unbiased legal judgment of that great lawyer, and we respectfully submit that it is as sound as any legal opinion ever given by him. We submit, therefore, that the chancellor manifestly erred in declining to follow the rule in the Searles case and subsequent decisions following the rule there announced.

The purpose of section 4852 of the Code, above referred to and requiring a bank or other collecting agency of a draft with bill of lading attached, to retain the funds so collected for ninety-six hours after the delivery of the bill of lading, would have little meaning and effect if the doctrine of the Searles case were overturned. It would, in effect, amount to a repeal of the section to do so. While a decision favorable to us on this point means a reversal of the case, yet we pass on to briefly answer another contention of counsel.

It is said, and cases are cited, holding that a national bank cannot become the purchaser of personal property, and hence, it is argued, could not warrant the quality of same.

The answer to this is that there is no evidence in this record that the Harpeth National Bank is a national bank except as indicated by its name, and that is not sufficient evidence. Furthermore, there is nothing in the pleadings setting up the contention that if, as a result of its connection with the drafts and ladings, that it has become a purchaser of same, that such purchase was *ultra vires*. Furthermore it is estopped to claim it had no such powers, 88 M. & M. 180, Middle paragraph.

All the parties are now before the court except that when the chancellor improvidently and improperly dissolved the injunction, the time for Flemming & English to answer had not arrived, and complete and perfect justice between all the parties can be had in the chancery

court upon a reversal of the decree of the chancellor therein.

We confidently and respectfully submit that the decree of the chancellor should be reversed, and the injunction reinstated, and the cause remanded for further proceedings in accordance with the rule of the Searles case and others.

*Percy & Percy,* for appellee.

In our original brief and argument the case of *First National Bank* v. *Felker,* 185 Fed. 678, was so conclusive upon the question of the conversion of property of the Harpeth National Bank by the Citizens Bank & Trust Company, we did not care to burden the court with any extensive citation of authorities; but there are two authorities which lay down the doctrine supporting the doctrine announced in the case of *First National Bank* v. *Felker, supra,* and we wish to submit same to the court. In 38 Cyc. page 2025, the principle is laid down, "Any use or disposition of a thing without the consent of the owner, or any misuse or abuse of a possession obtained with his consent, is an actionable conversion." Again, "any sale unauthorized by law or the consent of the owner which deprives him of personal property is an actionable conversion."

In *Laverty* v. *Snethern,* 68 N. Y. 522, 23 Am. Rep. 184, "the defendant received a promissory note from the plaintiff made by a third person and indorsed by the plaintiff, and gave a receipt therefor, stating that it was received for negotiation and the note to be returned the next day or the avails thereof. The plaintiff testified in substance that he told the defendant not to let the note go out of his reach without receiving the money. The defendant, after negotiating with one Foote about buying the not, delivered the note to him under the promise that he would get it discounted and return the money to defend-

ant, and he took away the note for that purpose. Foote did procure the note to be discounted, but appropriated the avails to his own use. . . . The question as to when an agent is liable in trover for conversion is sometimes difficult. The more usual liability of an agent to the principal is an action of assumpsit or what was formerly termed an action on the case for neglect or misconduct, but there are cases when trover is the proper remedy. Conversion is defined to be an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's right. A constructive conversion takes place when a person does such acts in reference to the goods of another as amount in law to appropriation of the property to himself. Every unauthorized taking of personal property, and all intermeddling with it, beyond the extent of the authority conferred, in case a limited authority has been given, with intent so to apply and dispose of it as to alter its condition or interfere with the owner's dominion is a conversion.''

These things are conclusively disclosed by the record; The Citizens Bank & Trust Company converted the drafts and bills of lading to its use and whether the Harpeth National Bank is considered a warrantor or whether Fleming & English are considered the owners of the drafts and bills of lading, by its act of converting the property by dealing with it contrary to instructions, the citizens Bank & Trust Company converted the property and S. Castleman by acquiescing and participating in the misconduct of the Citizens Bank & Trust Company occupied the position of a joint tort-feasor and the law is that there was a conversion and not a sale; that no sale can arise out of a tort; that there was no warranty because there was no sale, and therefore neither Fleming & English nor the Harpeth National Bank are liable to Castleman for a breach of warranty, if there was a breach of warranty. There is a liability on the part of

the Citizens Bank & Trust Company, first to the Harpeth National Bank because they converted the property of the Harpeth National Bank; and second, to S. Castleman because there was a defeat in the wheat which was sold by the Citizens Bank & Trust Company to Castleman. The Citizens Bank & Trust Company is responsible for this double liability. It arises solely because from its misconduct in breaching the duty owing to its principal.

We submit that it is incumbent upon the appellant, whether the appellant is the Citizens Bank & Trust Company or S. Castleman, to show a clear right to maintain the present action. In no brief filed and in no argument submitted has a single reason been advanced to support the maintenance of the present action. The duty does not devolve upon us, but it is incumbent upon the appellant to show to this court by what authority they are entitled to have the injunction made perpetual, restraining us from proceeding in the action at law. This is the sole question presented to this court, the other issues between the parties are immaterial. Is the Citizens Bank & Trust Company entitled to restrain the Harpeth National Bank from prosecuting its suit against the Citizens Bank & Trust Company in the circuit court of Washington county, Mississippi? At no time and in no way have counsel answered this question. They seek by *innuendo* to obscure the real issue in the case, advancing immaterial arguments; but at no time have they cited a single authority in support of their right to enjoin the suit at law, and will this court, in the face of all precedents, without the support of a single authority, permit Castlemen to jockey in the courts of Mississippi, instituting first one suit and then another, all instituted for the sole purpose of delying the payment of his just obligation, seeking to secure some compromise? We are constrained to feel that this court will not lend its aid to the furtherance of any such unlawful demand.

We are now sueing the Citizens Bank & Trust Company in the circuit court of Washington county for its unlawful act in converting the property of the Harpeth National Bank, and we submit that we are to have an adjudication on this question without regard to whatever may be the merits of the controversy as to Castleman's damage because of any supposed defect in the quality of the wheat. We submit that the case of the *First Nation Bank* v. *Felker, supra,* is conclusive and the question propounded by the court as to what was the law in Arkansas relative to the liability of a bank purchasing a draft with bill of lading attached is immaterial, for that doctrine has no application to the instant case. The quesion of the liability of a bank was raised in the Felker case and the court in that case said: "If plaintiff had waived the tort of its faithless agent, the defendant, and sued the Rogers Canning Company for the purchase price of the cans wrongfully delivered to the Rogers Canning Company, thereby ratifying the delivery, the sale being complete" a breach of warranty as to the condition of the goods could "with some degree of reason and perhaps some show of authority be urged; but such a defense is wholly inadmissible in this character of case for the obvious reason there can be no breach of warranty for the sale of defective goods if there is no sale."

And the court distinguished the Felker case expressly from the Searles case, and we are confident that this court will follow the decision in the Federal case which is based on reason and authority and will hold that there was no sale in the instant case either by Fleming & English or the Harpeth National Bank to S. Castleman. If any liability exists, it is on the part of the Citizens Bank & Trust Company, for they, if anyone, made the sale.

SYKES, J., delivered the opinion of the court.

From an order of the chancellor dissolving the temporary injunction granted the appellant bank restraining the appellee, Harpeth National Bank, from prosecuting its suit against appellant, pending in the circuit court of Washington county for damages for trover and conversion, this appeal is prosecuted.

The record in the case discloses that S. Castleman, a citizen and resident of Humpreys county, filed an original bill in the chancery court of that county against S. M. Fleming and W. H. English, partners doing business under the name of Fleming & English, residents of the City of Franklin, Tenn., the Harpeth National Bank, a banking corporation domiciled at Franklin, Tenn., and the Citizens' Bank & Trust Company, a banking corporation of the state of Mississippi domiciled in the town of Belzoni. The material averments of this bill are as follows, namely: Castleman in November, 1916, ordered from the Amzi Godden Seed & Grain Company, of Birmingham, Ala., a carload of wheat, which order was placed with Fleming & English, who on November 22d shipped to their order, notify complainant, at Belzoni, Miss., from Franklin, Tenn., one carload of seed wheat, and drew a draft upon complainant for the purchase price thereof, one thousand, two hundred dollars, with the bill of lading attached to the draft. That thereafter Castleman ordered another carload of wheat from Amzi Godden Seed & Grain Company, which order was also filled by Fleming & English, who shipped this car of wheat on December 7th, in the same manner as it did the first car, drawing a draft for one thousand and eighty dollars in the same manner the first draft was drawn. That it became necessary for Castleman to pay these two drafts before he could obtain the bills of lading and secure possession of the wheat or inspect it.

It is averred: That Fleming & English knew that the two cars of wheat were ordered for planting purposes, and thereby impliedly warranted that said wheat was suitable for planting purposes, was first-class in every respect, clean, and free from weed seeds of any kind which would lower the grade of the wheat, or flour milled therefrom. That, notwithstanding this knowledge, Fleming & English shipped in these two cars of seed which contained a large amount of small black seed, which proved to be corn cockle, a very bad pest to seed wheat, a very little of which is sufficient to reduce the grade of wheat. That said corn cockle is poisonous, and, when ground with wheat, the flour is rendered unwholesome, and even dangerous as food. That, after the wheat had been planted and had come up, Castleman incurred a large and heavy expense in attempting to have the cockle pulled out of the wheat. That he was unable to eradicate it in that way, and a large amount of the cockle grew up and was harvested with the wheat, lowering the grade of the wheat and market price thereof, and resulting in a loss of one thousand, one hundred and forty dollars. Castleman further avers that the two thousand, two hundred and eighty dollars paid by him in settlement of the drafts drawn by Fleming & English was paid to the Citizens' Bank & Trust Company for Fleming & English, and that said money is still in the possession of this bank. Complainant is informed and believes that the Harpeth National Bank claims to be the owner of the proceeds of the drafts, and that it had sued the Citizens' Bank & Trust Company, in the circuit court of Washington county, in tort for the proceeds of said drafts. In his prayer for relief he prays that proper process issue for all of the defendants, and that upon final hearing a decree be rendered in favor of him for the sum of one thousand one hundred and forty dollars, and that the Citizens' Bank & Trust Company be directed to pay him this

sum out of the proceeds of the two drafts which it has on hand. Complainant also prays for general relief.

The Citizens Bank & Trust Company answered the bill and also filed a cross-bill. In this answer and cross-bill it admitted having in its possession the proceeds of the two drafts. It stated that these drafts and bills of lading were delivered to Castleman upon the payment of the drafts. It disclaimed any knowledge of the wheat transaction between Castleman and Fleming & English. It averred that after the payment of these drafts Castleman instituted an attachment suit in the circuit court of Washington county for damages because of a breach of warranty as to the quality of the wheat in which suit this bank was garnished, and that it duly answered the garnishment, in which it admitted haveing in its possession the proceeds of these two drafts. It also averred: That the Harpeth National Bank had filed suit in the circuit court of Washington county against it in tort for two thousand, seven hundred dollars. alleging that it had converted the proceeds of these two drafts to its use. That this suit was brought by the Harpeth National Bank against it by collusion with Fleming & English and with the wrongful and fraudulent purpose and intention of preventing an adjudication of the question of liability of the said Fleming & English and the Harpeth National Bank to the said Castleman for breach of warranty as to the quality of the wheat. The prayer of the cross-bill is that an injunction issue restraining the Harpeth National Bank from further prosecuting its suit now pending in the circuit court of Washington county, and that on final hearing a decree be rendered adjudicating the rights and equities of all the parties of this suit, and directing this cross-complainant as to the payment and disposition to be made of the money in its possession. A temporary injunction was issued in accordance with the prayer of this cross-bill.

In its answer to the original bill of Castleman, the Harpeth National Bank disclaimed any personal knowledge of the ordering of the wheat from Amzi Godden Seed & Grain Company; admitted the shipments made by Fleming & English of the two cars of wheat and the drawing of the drafts in the manner set out in the bill; disclaimed any information on its part of the purpose for which the wheat was ordered. It denied on information and belief that there was any implied warranty that the wheat should be free from weed seed of any kind; denied on information and belief that the wheat contained corn cockle, and denied that the complainant, Castleman, incurred a large expense in having the cockle pulled up, denied that the cockle harvested with the wheat lowered the grade of the wheat, but, on the contrary, alleged on information and belief that the wheat harvested by Castleman was unusually good and sold, because of its superior quality, for more than the fair market price, and that Castleman sustained no loss. It denied that the proceeds of the two drafts paid by Castleman were paid by him to the Citizens' Bank & Trust Company for Fleming & English; but alleged the fact to be that this bank purchased said drafts on November 22 and December 7, 1916, respectively, and were *bona fide* and innocent purchasers for value of the same; that in the usual course of business it sent these drafts with bills of lading attached to the Citizens' Bank & Trust Company with instructions that the bills of lading should be surrendered only upon the payment of the respective drafts; and that it is informed and believes and charges that the bills of lading were surrendered by the Citizens' Bank & Trust Company to Castleman before the drafts were paid in violation of the instructions under which they were sent. On information and belief it alleges that the claim of Castleman against Fleming & English is fictitious and without merit and made for the purpose of defeating the collection of the

amount due for the wheat or of securing a delay in the payment of said amount by Castleman; that Fleming & English have no interest in the money paid by Castleman to the Citizens' Bank & Trust Company, and that the Citizens' Bank & Trust Company violated its instructions and therby became primarily responsible to this defendant for the value of the wheat.

Its answer to the cross-bill of the Citizens' Bank & Trust Company contains practically the same averments as does its answer to the bill of Castleman. In this answer it also admits the bringing of the suit against the Citizens' Bank & Trust Company in the circuit court of Washington county. It denies that this suit was brought by collusion with Fleming & English or with any wrongful or fraudulent purpose and intention of preventing the adjudication of the liability of the said Fleming & English, or of this defendant to the said Castleman for breach of warranty. It alleges that the Citizens' Bank & Trust Company turned these drafts and bills of lading over to Castleman without first requiring him to pay the same, contrary to their instructions and in collusion with Castleman; that it wrongfully retained possession of the proceeds of the drafts for an unreasonable length of time after the same had been paid; that therefore the Citizens' Bank & Trust Company became primarily responsible to this defendant for the proceeds of these drafts. It asks for a dissolution of the temporary injunction. The Harpeth National Bank, after the filing of these two answers, filed a motion to dissolve the temporary injunction. It is unnecessary to set out in full grounds stated in the motion, as they will be referred to in stating the argument of counsel for appellee. This motion was heard on affidavits. The Harpeth National Bank filed an affidavit of Newt Cannon, Jr., its cashier. In this affidavit affiant states that the Harpeth National Bank for a valuable consideration purchased these drafts at the time alleged

in its answer; that they were sent to the Citizens' Bank & Trust Company of Belzoni, Miss., with bills of lading attached, with instructions to surrender the bills of lading upon the payment of the drafts, the proceeds to be remitted at once to the Harpeth National Bank; that the Citizens' Bank & Trust Company, as the agent of the Harpeth National Bank, was bound by these instructions, but, contrary thereto, delivered the bills of lading without the payment of the drafts; that when Castleman paid the drafts on January 2, 1917, the Citizens' Bank & Trust Company held the proceeds thereof until a garnishment was served upon it on January 31, 1917; that the Harpeth National Bank was the owner of these drafts; and that Fleming & English had no interest therein or in the proceeds therefrom.

The complainant, S. Castleman, filed a very lengthy affidavit substantially sustaining the allegations of his original bill and of the answer and cross-bill of the Citizens Bank & Trust Company. This affidavit goes into details as to the purchase of the two carlods of wheat, the inferior grade of the wheat caused by its containing a number of cockle seed, the trouble and expense he went to in attempting to have the cockle pulled up after the wheat had come up; that these two drafts were paid by him on December 21, and 22, 1916, respectively that he was required to pay the two drafts before he could get possession of the bill of lading and of the two cars of wheat. The affidavits substantiates the averments of the bill as to the extra expense incurred by him in attempting to eradicate the cockle from the wheat. To this affidavit exhibits were made of correspondence between Castleman and Fleming & English, and Castleman and the Amzi Godden Seed & Grain Company. Upon motion the letters to and from the Amzi Godden Seed & Grain Company were excluded by the chancellor, but those between Castleman and Fleming & English were admitted. A perusal of this corres-

pondence shows that Fleming & English were attempting
to adjust the damage Castleman claimed to have sustain-
ed.  It shows that Fleming & English were aware of the
fact that the Citizens' Bank & Trust Company had not
remitted the proceeds of this collection because of a
request of Castleman not to do so while they were at-
tempting to make this adjustment.  The letters from
Fleming & English show that they claimed or believed
that they were the owners of the wheat and of the pro-
ceeds of the drafts paid by Castleman to the Citizens'
Bank & Trust Company.  The chancellor dissolved the
injunction.  The order dissolving the injunction recites
that the cause was submitted upon the pleadings, the
motion to dissolve and the affidavits taken, and the
argument of counsel.

Mention is made in the answer of the Harpeth Nation-
al Bank that the pleadings filed in the case of this bank
against the Citizens' Bank & Trust Company pending in
the circuit court of Washington county are made ex-
hibits to this answer.  These exhibits however, are not
shown in the record and for that reason cannot be noticed
by us on this appeal.  It is contended by the appellee
that the lower court was correct in dissolving the in-
junction for three reasons:

"First.  Because a bank purchasing a draft with
bill of lading attached does not assume any of the lia-
bilities of the seller of the goods and is not liable on a
warranty made by the vendor of the goods represented
by the bill of lading.

"Second.  That the Harpeth National Bank, being a
banking institution incorporated under the laws of the
United States, was without power to puchase the goods
represented by the bills of lading and could make no
warranty in regard thereto; that a national bank cannot
purchase personal property; that the purchase of person-
al property would be *ultra vires.*

"Third.   That by its action in the dealing with the drafts and bills of lading, the Citizens' Bank & Trust Company converted the drafts and bills of lading to its use and became the owner of same, and, if there was a breach of warranty connected with the wheat, the Citizens' Bank & Trust Company is liable to Castleman, and neither Fleming & English nor the Harpeth National Bank is liable therefor."

As to the first proposition, in their very able brief counsel for the appellee admit that in order to uphold the order of the chancellor we will. have to overrule the opinion of the court in the case of *Searles Brothers* v. *Grain Company,* 80 Miss., 688, 32 So. 287, and the case of *Mobile Auto Co.* v. *Sturgess & Co.,* 107 Miss. 848, 66 So. 205.   This question was fully considered by the court in banc and the doctrine announced in the Searles Case was reaffirmed in the case of *L. Marks' Sons* v. *West Tennessee Grain Co.,* 81 So. 162.

The second question presented is that the Harpeth National Bank, being a national bank, under section 5136 of the Revised Statutes of the United States (U. S. Comp. St., section 9661), is not authorized to purchase personal property, and therefore the purchase of the two cars of grain was *ultra vires* and void.   Under this section of the Revised Statutes, a national bank is allowed to discount and negotiate drafts, bills of exchange, and other evidence of indebtedness.   It is thereby authorized to purchase drafts with bills of lading attached.   When, as a consequence of such purchase, it becomes the owner of personal property, this is but an incident to the purchase of the draft and is not prohibited under the above section.   *McLean* v. *City State Bank of Mangum, Okl.,* 210 Fed. 21, 126 C. C. A. 601; *Marsh Milling Co.* v. *Guaranty State Bank* (Okl.), 171 Pac. 1122, L. R. A. 1918D, 704.   While this question does not seem to have been expressly raised in the

Searles Case, supra, .yet in that, case the suit was also against a national bank.

As to the third question, namely, that there was a con-version of the draft, bill of lading, and wheat by the Citizens' Bank & Trust Company, because this bank turned over to Castleman these two cars of wheat be-fore the drafts were paid, it is to be noted from the affidavits and pleadings that this is a sharply controvert-ed question of fact. When such is the case, an injunction should not be dissolved upon mere affidavits, but the case should proceed to·final hearing. *McKinzie* v. *McCrory*, 88 Miss. 86, 40 So. 483. It is also a very grave question of law under the conflicting facts as to whether or not there was a conversion. The pleadings and affidavits raise a number of sharp conflicts in the testimony. From this record it is impossible to say whether Fleming & English or the Harpeth National Bank was the owner of the drafts and wheat; whether or not it was not with the consent of the owner that the bank withheld the proceeds; whether or not the drafts were paid when the bills of lading were turned over to Castleman. There could be no conversion by failure to promptly remit the proceeds of the drafts, in the absence of a demand from the owner therefor.

This suit is commonly termed an "attachment in chan-cery." All of the parties are in court, and their respective rights can be fully and completely adjudicated in this one suit.

The order of the lower court is reversed the temporary injunction is reinstated, and the cause remanded.

*Reversed and remanded.*