*A. W. ROBERTSON, Gdn., v. J. G. and R. N. WALL.

*Confederate Securities—Guardian—Negligence.*

1. The great depreciation reached by Confederate securities in June and July, 1863, raises a presumption of a want of caution on the part of a

_____

* Ruffin, J., did not sit on the hearing of this case.

fiduciary who collects well secured ante-war debts and invests the proceeds in such securities and calls for exculpatory evidence.

2. When the evidence shows that a guardian, without any sinister or selfish motive appearing, makes such an investment of funds arising from the collection of well-secured debts contracted before the war, he will be exonerated from blame, upon showing that he had invested his own funds in the same way ; that he acted upon the advice of experienced business men ; that he failed after due trial to make private loans ; and that the money received in July, 1863, was the balance of an entire debt the other portions of which had been collected prior to 1863.

(*Cummings* v. *Mebane,* 64 N. C., 315 ; *Sudderth* v. *McCombs,* 79 N. C., 398 ; *Wells* v. *Sluder,* 72 N. C., 435 ; *Purser* v. *Simpson,* 65 N. C., 497 ; *Green* v. *Barbee,* 84 N. C., 69, cited and approved.)

SPECIAL PROCEEDING for account and settlement, commenced in the probate court, and heard at Fall Term, 1879, of STOKES Superior Court, before *Gilmer, J.*

Granville Wall died in 1859 intestate, and administration on his estate was committed to his widow Mary F. Wall who entrusted the entire management of the business to her father, the plaintiff. At September term, 1860, of the county court of Stokes, the plaintiff was appointed guardian to the defendants, infant children of the intestate, and gave bond as required by law. At May term, 1861, commissioners were appointed by the same court to audit the administration account then exhibited, which was done and they made their report showing to be due from the administratrix to the distributees the sum of $7,384.79, whereof she and her two children were each entitled to $2,462.59. This fund derived from the sale of slaves and other personal estate consisted mainly of bonds which were transferred to the plaintiff and thereafter held by him as guardian. The intestate also owned at his death a large and valuable tract of land which on a petition filed in the names of the widow and the infant defendants in the court of equity of Rockingham, where the land was situated, was sold under a decree rendered at the fall term, 1859, for $9,100 to one J. B.

Vaughn. The sale was not confirmed and a re-sale was ordered at which on June 16, 1860, R. B. Webster became the purchaser at the price of $10,861, and gave his bonds for equal parts thereof, payable at 6 and 12 months. The clerk and master in his report thereof, pursuant to an interlocutory order, ascertained and reported the value *in presenti* of the widow's dower right on the fund at $2,500. The land was sold at the suggestion of the attorney whose professional advice and aid had been sought in conducting the administration, that thereby the dower interest could be converted into an absolute sum of money, and the plaintiff also concurring in the expediency of the change of the real estate into money, as the family were to remove and thereafter reside with him, and the necessary renting would damage. and deteriorate the property during the long minority of the infants. The moneys due for the land were paid to the guardian in different sums and at different times as appears from his receipt to the clerk and master as follows: On September 21, 1861, $200; on March 8, 1862, $1,000; on July 15, 1862, $2,500; on August 11, 1862, $2,000; on August 26, 1862, $5,000; on June 4, 1863, $600; and on July 28, 1863, $600, the residue.

The defendants having arrived at full age, the present suit was brought against them for a settlement of the trust estate before the probate judge, who took a large volume of oral and other evidence relating to the guardian's administration, and stated in detail the account of his receipts, disbursements and investments, in which he finds the plaintiff indebted as follows: To James G. Wall on June 1, 1875, $497.89; and to Robert N. Wall on June 1, 1876, $755.75.

In reaching this result the plaintiff is charged with the sum of $325.26, due to each ward which the plaintiff had erroneously applied as commissions in reduction of the shares of his wards in the balance transferred from the administration account, while it appears the claim had al-

ready been allowed and deducted. As to the correction of this obvious error, there is no dispute. The accounts between the guardian and his wards are stated upon the basis of annual rests, and the carrying the successive balances of each year into the next as in ordinary guardian settlements.

To the report the plaintiff takes a single exception to each account, in that, he is entitled to and not allowed a credit, as compensation for his services in managing the estate, a sum he claims sufficient to extinguish the indebtedness arising out of the error in the reduction of the sum received from the administratrix.

The defendants file numerous exceptions which are substantially comprised in these:

1. That the plaintiff is not charged with the debts due by T. L. Wall, Robert Lewis, Elizabeth Carter and Booker.

2. That he is not charged with the proceeds of the sale of the land, needlessly and negligently collected and lost.

3. That the plaintiff is not found to be negligent and careless in collecting the well secured funds of the estate, and investing them in securities of the Confederate States, and is liable therefor.

These exceptions were all overruled by the probate judge, and upon appeal that of the plaintiff was sustained, and those of the defendants which apply to the $1,230, the residue of the sales of the lands, collected in June and July, 1863, and all others overruled. From these rulings adverse to either, the parties respectively appeal to this court.

*Messrs. John H. Dillard* and *Boyd & Reid*, for plaintiff.
*Messrs. Watson & Glenn*, for defendants.

SMITH, C. J., after stating the case. We see no satisfactory grounds for reversing the decision of his Honor in allowing remuneration to the plaintiff for his management of the

trust estate in the form of commissions on the sums received. In law whatever per centum may be allowed should diminish *pro tanto* the amount received, when so received, and the sum remaining constitutes the part wherewith he is chargeable. While it may seem unimportant, when the entire amount has been lost under circumstances acquitting the guardian of personal responsibility, it is fair and reasonable to state correctly his dealings with the trust fund and the extent of his possible responsibility to the wards, and material in the present case since he is made accountable for the money erroneously charged, and is not excused for its loss.

The essential element in the controversy, however, is the plaintiff's liability for his various collections of well secured notes due for the land and otherwise, and the investments in Confederate securities by which the trust estate has been almost wholly destroyed. The plaintiff denies, and the defendants insist upon, his liability for losses thus incurred by the needless and negligent conduct of the guardian in changing the investments, but for which a large portion of the trust estate would have been preserved for the wards notwithstanding the financial disasters following the overthrow of the Confederate government.

His Honor in passing upon the question draws a separating line between the collections, thus lost, made in June and July, 1863, and those made before, declaring the plaintiff chargeable with the former ($1230) and exonerating him from liability for all moneys previously received. The correctness of this ruling is presented in both appeals.

There have been numerous cases before the court involving the management of trust estates during the late civil war, and the personal responsibility incurred by trustees in converting funds into Confederate securities. The general rule is well settled and thus declared by SETTLE, J. in *Cummings* v. *Mebane* 63 N. C., 315: "The degree of diligence to which, we think, they should be held liable is that which

a prudent man at that time would have exercised in the management of his own affairs," and he subsequently adds: " where a party acting in good faith received Confederate currency and afterwards lost, not only trust funds but his own also, he is to be regarded with all the favor that is consistent with the policy of the law in regard to those who undertake to discharge a trust."

The governing principle may be easily expressed in general terms, but the perplexing difficulty arises in its attempted application to the varying facts of each particular case. Good faith as well as ordinary prudence are required in the exculpation of a trustee for losses produced by his own unwise management of a fund committed to his control and protection; and hence it becomes necessary to inquire into the surrounding circumstances and the influences that prompted his action to determine in each particular case the question of the personal accountability of the fiduciary. " We cannot close our eyes," is the language of the court in the case cited, " upon the past, and forget that thousands of our most prudent citizens have become bankrupt by investments which appeared to be the very best that could be made at the time. It is one thing to sit in judgment upon the past, and quite another to foresee consequences It will not do to look back now and see how estates might have been better managed, and exact of those who had them in charge that degree of diligence which would have proved most beneficial in each particular case."

The great depreciation to which Confederate securities of all kinds had been reduced in June and July, 1863, raises a presumption of a want of fiduciary diligence and care, and calls for explanatory and exculpatory evidence to meet and remove it, and to excuse the act of substituting for solvent personal obligations such discredited funds. *Saddurth* v. *McCombs* 79 N. C., 398.

In the effort to fix upon some definite period up to which

such conversions of the trust estate made in good faith would, and after which they would not, be excused in a trustee, the court leaves the entire year, 1863, as marking the dividing line, and whose breadth the solution of the question in any particular case is made dependent upon the attending circumstances. *Wells* v. *Sluder*, 72 N. C., 435.

We must then look to the facts shown in the testimony connected with the impeached conduct of the plaintiff in making the collections and investments. There is no indication in the evidence of any sinister purpose in the plaintiff, or of any personal advantage to accrue to him in making the unfortunate change in the condition of the trust estate, or that he was prompted by any influence adverse to the interests of his young grand-children who with their mother had returned to the parental roof and were all the time under his protection and care. In his own testimony upon a full and searching examination he declares that he was at a loss to know what to do with the funds; they were bearing simple interest, and he sought advice in the emergency from some of the wisest and most experienced men in his section, all of whom advised him to invest in Confederate bonds, as one or more of them was then doing with trust funds under their control, not only because they bore a higher rate of interest, but because also it was payable semi-annually; that he had tried to make private loans and without success; and he thought the interests of his wards would be promoted by the purchase of Confederate bonds.

Under these circumstances, in the exercise of his own and in reliance upon the judgment of others whom we consulted, the disastrous investments were made for the consequences of which, without any just grounds, as far as we can see in the proofs to impeach the integrity and good faith of the act, it is now insisted he is personally liable, and while he loses funds of his own similarly disposed of, he must replace those of his wards. In the report of the probate judge, he finds

that the plaintiff made the investments "honestly believing it was the best he could do, and under the advice of R. W. Lawson and others who were known to him to be prudent business men," and that "the guardian himself as well as the mother of the wards made investments of their individual funds in the same kind of Confederate securities." This finding is in our review of it, fully borne out by the evidence, and is accepted as the basis of the rulings in the superior court.

His Honor, however, adjudged the plaintiff liable for the two sums collected in June and July, 1863, the remaining purchase money for the land as we infer upon the authority of *Purser* v. *Simpson*, 65 N. C., 497, and other cases of like import. While we do not propose to disturb the general proposition that good faith even will not protect from personal responsibility a guardian who accepts Confederate currency at par in payment of solvent debts contracted in good funds at the time when the last collections were made, of the proceeds of the sale of the land, yet it must be remem· bered that this was the last of the fund, and it could scarcely be expected that this should be left out in the disposition of the preceding collections. If the guardian is to be justified in what he had before done, it would seem to be reasonable that he should be in this, under the common motive that prompted all. We discover no just principle in discriminating against the plaintiff in this consummating act in reference to the fund.

The exceptions relating to other debts due the wards, resting upon the same ground of imputed negligence, must be disposed of in a similar way.

Although we are required in a case like the present, which would formerly have been of exclusive equitable cognizance, to examine the evidence and determine its force and credit in proving facts, we should be reluctant to disturb the findings and conclusions of the probate and revising judge,

where the matter is left in reasonable doubt and there is no decided adverse preponderance in the proof. *Green* v. *Barbee,* 84 N. C., 69.

We therefore declare there is error in the court below in sustaining the defendants' exceptions by which the plaintiff is charged with the sum of $1,200 collected in June and July, 1863, and we affirm all the other rulings of the court upon the exceptions. The account will be reformed accordingly, and to this end there must be a reference to the clerk of this court and the cause will be retained for further proceedings.

PER CURIAM.                     Judgment accordingly.