KENNETH F. LOWDERMILK v. BENJAMIN F. BUTLER.

(Filed 23 November, 1921.)

1. **Corporations—Dissolution—Continuance for Certain Purposes—Deeds and Conveyances—Statutes.**

The certificate of dissolution of a corporation of the Secretary of State continues the corporation for three years, making the directors trustees unless otherwise ordered by the court, with full power, among others specified, to settle its affairs, close its business, etc., C. S., 1193, and the provisions of the following section, 1194, that the directors as trustees may sell and convey the corporate property, does not exclude the idea that they may do so in the name of the corporation in whom the original legal title was originally vested.

2. **Same—Probate.**

Where the certificate of the probate of a deed from a corporation, dissolved upon certificate of the Secretary of State, made within the time allowed by C. S., 1193, recites as a fact judicially found that the deed was made in the name of the corporation by the order of the directors, the trustee's, under the statute, objection that it was not executed in the method required by C. S., 1194, is untenable; and the signature of the agent in charge, if made upon the mistake that he was in law the assignee of the mortgage, is only surplusage, and harmless.

3. **Appeal and Error—Opinions—Stare Decisis—Justices' Courts—Judgments—Superior Courts—Docketing—Rules of Property.**

The doctrine of *stare decisis* is established by the Court under an ancient and unbroken line of decisions, and when involving the title to lands, should be regarded and upheld by the courts, though this rule is not inflexibly binding upon their judgment in avoiding palpable error: *Held*, in this case, the Court will not disturb the precedent established that an execution may not validly issue against lands when docketed in the Superior Court more than a year after its rendition in the courts of the justice of the peace. The doctrine of *stare decisis* and its requisites, and of *fiat justitia ruat coelum*, discussed by WALKER, J.

4. **Deeds and Conveyances—Mortgages—Judgments—Execution Sales—Title.**

The owner of land conveyed to A., taking immediately a mortgage to secure the purchase price, and thereafter the land was sold in execution of a judgment against A., under which the defendant claims title by deed accordingly made; and the plaintiff claims as a purchaser under the executed power of sale contained in the mortgage: *Held*, the title remained in the mortgagee and the purchaser at the mortgage sale and his grantee obtained a good title as against that claimed under the execution sale, notwithstanding the mortgage note may have been assigned to a third person. *Semble*, the title passed immediately from A., under the mortgage, leaving none upon which the execution under the judgment could take effect.

APPEAL by defendant from *Ray, J.,* at the May Term, 1921, of MOORE.

This is an action to settle the title to land described in the pleadings, the plaintiff and defendant each claiming under the Piedmont Plantation Company, as the origin of title.

The Piedmont Plantation Company conveyed the land to A. Legler, 20 April, 1912; and on the same day A. Legler, to secure the purchase money, made a mortgage to it. The mortgage was recorded 4 June, 1912, and the deed thereafter on 27 August, 1912.

On 28 May, 1913, the Piedmont Plantation Company and R. W. Pumpelly (who claimed in the deed to be the assignee of the mortgage), after sale under the power contained in the mortgage, conveyed the land to the plaintiff by deed, which is copied in the record.

To establish title in himself and disprove title in plaintiff, the defendant relied on the following records and deeds introduced in evidence by him:

1. A judgment in favor of C. S. Fry and against Alexander Legler, rendered before a justice of the peace on 25 September, 1909, and docketed in the Superior Court of Moore County on 21 July, 1911, on a transcript of said judgment from the justice of the peace. The transcript itself was issued by the justice of the peace on the same date as the rendition of the judgment, and was docketed in the Superior Court more than twelve months from said date, but prior to the date of the original deed from Piedmont Plantation Company to Alexander Legler, and some time before the mortgage from Legler to Piedmont Plantation Company, upon which plaintiff relies to make out his title, was recorded.

2. Deed from D. Al. Blue, sheriff of Moore County, to George H. Humber, dated 21 August, 1913, and recorded 23 August, 1913, in Book of Deeds No. 57, at page 244. This deed is set out in the record in full, from which it will appear that it was made pursuant to a sale of the land in controversy under an execution issued on the judgment of C. S. Fry against Alexander Legler aforesaid, at which sale George H. Humber became the purchaser.

3. The evidence of M. M. Stutts, shown in the record, that Alexander Legler was a nonresident of the State during the year 1913, the date of the sale of the land by the sheriff of Moore County under the execution to George H. Humber.

4. Several successive deeds, beginning with that of George H. Humber and wife, conveying ultimately such title as Humber received under the sheriff's deed to the defendant.

5. The record of the dissolution of Piedmont Plantation Company, a corporation, as contained in the record book of incorporations No. 2, at page 32, in the office of the clerk of the Superior Court of Moore County. This record is fully set out in the case on appeal, from which it will ap-

pear that by voluntary proceedings as provided by law, Piedmont Planta-
tion Company was dissolved as a corporation by the Secretary of State
on 5 July, 1912, prior to the execution of its deed to plaintiff, on which
he relies for title, which is dated 28 May, 1913.

The following is Section 1194 of the Consolidated Statutes, relating
to conveyances of property belonging to dissolved corporations:

"DIRECTORS TO BE TRUSTEES; POWERS AND DUTIES.

"On the dissolution in any manner of a corporation, unless otherwise
directed by an order of the court, the directors are trustees thereof, with
full power to settle the affairs, collect the outstanding debts, sell and
convey the property, and, after paying its debts, divide any surplus
money and other property among the stockholders. The trustees have
power to meet and act under the by-laws of the corporation and, under
regulations to be made by a majority, to prescribe the terms and condi-
tions of the sale of such property, and they may sell all or any part for
cash, or partly on credit, or take mortgages or bonds for part of the pur-
chase price for all or any part of the property. They have power to sue
for and recover the said debts and property in the name of the corpora-
tion, and are suable in the same name for the debts owing by it, and are
jointly and severally responsible for such debts only to the amount
of property of the corporation which comes into their possession as
trustees."

There was a verdict for the plaintiff, and from the judgment thereon
the defendant appealed.

*H. F. Seawell* for plaintiff.
*U. L. Spence* for defendant.

WALKER, J., after stating the case: We will consider the questions
raised by this appeal in the order of their statement in the assignments
of error, briefs and argument before us.

1. The plaintiff attacks the last deed on the ground that on 5 July,
1912, the Secretary of State certified to the clerk of the Superior Court
of Moore County that the Piedmont plantation Company on that date
had filed its consent in writing to the dissolution of the corporation,
executed by the requisite number of stockholders, Raphael W. Pumpelly
being the agent therein named and in charge thereof, and that the corpo-
ration could not thereafter convey its property. This contention, as we
think, is based upon a misconception of the statute. The corporation
did not cease to exist at the date of the filing of the certificate of dissolu-
tion, as contended by appellant, but continued three years from that
date as a body corporate, by express provision of C. S., sec. 1193, which

is, that all corporations whose charters expire, by their own limitation, or are annulled by forfeiture, or otherwise, shall continue to be bodies corporate for three years after the time when they would have been dissolved, "for the purpose of prosecuting and defending actions by or against them, and of enabling them gradually to settle and close their concerns, to dispose of their property, and to divide their assets," etc. But the defendant relies upon the provisions of the next section (1194), which is above set out, in our statement of the case. It appears therefrom that the "directors, as trustees, may sell and convey the corporate property upon such terms as they may prescribe," but this does not exclude the idea that, in conveying the property, they may not do so in the name of the corporation in whom the legal title was originally vested. It may be conveyed in the name of the corporation by their order or direction, or perhaps they may convey it in their own names as directors and trustees. It appears in this record, and in the certificate of probate, as a fact judicially found by the clerk of the Superior Court, that the deed was made in the name of the corporation by order of the directors who, under the statute, were the trustees. So that the statute was fully complied with.

By reason of his appointment as agent in the dissolution proceedings of the corporation, it is probable that R. W. Pumpelly concluded he was thereby made the assignee of the mortgage, and out of abundance of caution joined the corporation in the sale of the land and in the execution of the deed to the plaintiff. If he was not such assignee, his joining in the sale, and in the execution of the deed, were harmless acts.

2. The defendant, through his counsel, further contends that on 25 September, 1909, C. S. Frye recovered a judgment for $26.89 against A. Legler, before a justice of the peace of Moore County, which was filed and docketed in the Superior Court on 21 July, 1911, more than a year after its rendition, and that execution issued on it from the Superior Court, and the land in controversy was levied on as the property of A. Legler, and sold and conveyed by the sheriff to G. H. Humber, from whom, by mesne conveyances, the defendant claims title.

It is well to observe, in passing, that the judgment roll, introduced in evidence by defendant, shows that all of the executions issued to the sheriff on this judgment were returned by him without action, even down to 6 May, 1918, and the clerk was still issuing executions thereon so late as 1 April, 1921.

In order to sustain the claim of title by the defendant under the sheriff's sale and deed, the appellant's counsel frankly admitted that it is necessary for this Court to overrule several of its well-considered decisions heretofore rendered and to upset a doctrine which has existed

and been recognized as a rule of property for well-nigh half a century. *Williams v. Williams,* 85 N. C., 383; *Woodard v. Paxton,* 101 N. C., 26; *Cowen v. Withrow,* 114 N. C., 558. No good reason has been advanced for such action on our part. What this Court would decide, if the question were *res nova,* or presented now on its legal merits, for the first time, it is futile to declare, as we are satisfied that those cases should stand unmolested, after such repeated adjudications, as it is the interest of the State that there should at some time and somewhere be an end of controversy. Some questions may fairly and justly be considered as closed by the former decisions of this Court, and especially where rights of property are involved, and even those of contracts, in some cases, in order that it may be known how to deal safely in our daily transactions. We should impart firmness and stableness to them, so that what we have declared to be the law in the past may not be easily assailed and overthrown in the future, thereby impairing public confidence in the integrity, permanency and reliability of what we may decide to be the rule of reason, and of conduct, which is sanctioned by the law. This is essential that our judgments may acquire permanency and become trustworthy, and never subject to change, unless after maturer consideration we may be convinced that there is palpable error, and that it is better to retrace our steps and change our former decisions because of the greater benefit to be derived therefrom. But such instances are very rare, and if possible should be reduced to the minimum, as change in our opinions is far more apt to result in harm than in any indispensable benefit. *Stare decisis et non quieta movere,* the Latin phrase, which means to stand by decided cases and uphold precedents by maintaining former adjudications rather than unsettle those things which have been established, is one of the ancient maxims, which has improved by its age, and is worthy of the greatest reverence, and the fullest acceptation. It was said many years ago that a point which has often been adjudged should be permitted to rest in peace. *Spicer v. Spicer,* Cro. Jac., 527 ('79 Eng. Reprint, 451); 1 Kent's Com., 477. The rule expresses the principle, in tangible form, upon which rests the authority and binding force of judicial decisions as precedents in subsequent litigations. When more mildly expressed, the rule means, in general, that when a point has been once settled by judicial decision it forms a precedent for the guidance of the courts in similar cases. The Madrid, 40 Fed. Rep., 677, 679. But it has been said that where grave and palpable error, widely affecting the administration of justice, must either be solemnly sanctioned or repudiated, the maxim *Fiat justitia ruat coelum* should apply, and not the rule of *stare decisis. Ellison v. Georgia, etc., R. Co.,* 87 Ga., 691. As a general rule, where a principle of law has become settled by a series of decisions, it is binding on the courts and should be followed. But it has

been determined that a single decision is not necessarily binding. Again the maxim *stare decisis* is not imperative; and an opinion is not authority for what is not mentioned therein and what does not appear to have been suggested to the court from which the opinion emanates. A decision in conflict with prior decisions, and not supported by reason or authority, will not be adhered to where it is not probable that property rights will be seriously affected, and positive authority of a decision is coextensive only with the facts upon which it is founded. 11 Cyc., 745, and notes; *Gage v. Parker,* 178 Ill., 455; *Lawson v. Bank,* 92 N. W., 729. It has been well and wisely said that precedents are to be regarded as the great storehouse of experience; not always to be followed, but to be looked to as beacon lights in the progress of judicial investigation which, although at times they be liable to conduct us to the paths of error, yet may be important aids in lighting our footsteps on the way to truth. *Leavitt v. Morrow,* 6 Ohio St., 71.

After all has been repeated, that has been, or can be said pro or con upon this important question, we concur in the view taken by a court of the highest authority in another case, that whatever difference of opinion may have existed in this Court orginally in regard to these questions, or might now exist if they were open for reconsideration, it is sufficient to say that they are concluded by the former adjudications. The argument upon both sides was exhausted in the earlier cases. It could subserve no useful purpose again to examine the subject. *Parker v. W. L. Cotton, etc., Co.,* 2 Black, 545 (67 U. S., 545), 17 L. Ed., 333.

It all comes to this that former precedents should not be reversed except upon strong and imperious necessity. The Federal Supreme Court, and some courts in other jurisdictions, have held that a decision is not an authority upon a question not considered by the court, though involved in a case decided. *Durouseau v. U. S.,* 6 Cranch, 307 (3 L. Ed., 232); *Buel v. Van Ness,* 8 Wheaton, 312 (5 L. Ed., 624); *New v. Oklahoma,* 195 U. S., 252 (49 L. Ed., 182); *U. S. v. Mire,* 3 Cranch, 159 (2 L. Ed., 397); *Cross v. Burke,* 146 U. S., 82 (36 L. Ed., 896); *McCormick H. Mach. Co. v. Aultman Co.,* 169 U. S., 606 (42 L. Ed., 875), and other cases cited in notes to 2 Digest U. S. S. C. Reports (L. Ed.), p. 2327.

We admit that the rule which requires us to uphold former decisions upon the same subject is not an inexorable one, nor is it mandatory upon the Court. *Hertz v. Woodman,* 218 U. S., 205. There is some flexibility in it, and it has been said that it should not be employed to perpetrate error (15 Corpus Juris, p. 956, sec. 357), but the Court will not listen readily, and surely not with favor, to appeals for reversals of former adjudications, where manifest error is not first shown. But there is none such shown here. With regard to this rule we have ourselves

quite recently said that the people are supposed to have confidence in their highest Court, at least to the extent of ascribing to it the virtue of consistency and a desire to see that by no lack of stability in its decisions shall any citizen be jeopardized or prejudiced in his rights, because he has simply acted upon the supposition that what the Court has so solemnly determined will again be its decision upon the same state of facts, or that, at least, if it does change its mind, his rights and interests will be thoroughly safeguarded. If courts proceeded upon any different theory in the decision of causes, the people would be left in a state of uncertainty as to what the law is, and could not adjust their business affairs to any fixed and settled principles which would, of course, produce most mischievous, if not disastrous, consequences. *Hill v. R. R.,* 143 N. C., 581. See, also, *Mason v. Cotton Co.,* 148 N. C., 492, and *Williamson v. Roban,* 117 N. C., 302. A great law writer once said about this rule of the law that he did not wish to be understood to press too strongly the doctrine of *stare decisis,* when he recollected that there are more than one thousand cases to be pointed out in the English and American books of reports, which have been overruled, doubted, or limited in their application. It is probable that the records of many of the courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuation of error. Even a series of decisions are not always conclusive evidence of what is law; and the revision of a decision very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule, and the extent of property to be affected by a change of it. *Lord Mansfield* frequently observed, that the certainty of a rule was often of much more importance in mercantile cases than the reason for it, and that a settled rule ought to be observed for the sake of property; and yet, perhaps, no English judge ever made greater innovations and improvements in the law, or felt himself less embarrassed with the disposition of the elder cases when they came in his way to impede the operation of his enlightened and cultivated judgment. The law of England, he observed, would be an absurd science were it founded upon precedents only. Precedents were to illustrate principles and to give them a fixed certainty. His successor, *Lord Kenyon,* was said to have acted like a Roman dictator, appointed to recall and reinvigorate the ancient discipline. He controlled or overruled several very important decisions of *Lord Mansfield* as dangerous innovations, and on the ground that they had departed from the precedents of former times and disturbed the landmarks of property, and had unauthorizedly superadded equity powers to a court of law. "It is my

wish and my comfort," said that venerable judge, "to stand *super anti-
quas vias.* I cannot legislate, but by my industry I can discover what my
predecessors have done, and I will tread in their footsteps." The English
courts seem now to consider it to be their duty to adhere to the authority
of adjudged cases, when they have been so clearly and so often, or so
long established as to create a practical rule of property, notwithstanding
they may feel the hardship, or not perceive the reasonableness of the rule.
There is great weight in the maxim of *Lord Bacon,* that *optima est lex,
quae minimum relinquit arbitrio judicis; optimus judex, qui minimum
sibi.* The great difficulty as to cases consists in making an accurate
application of the general principle contained in them to new cases, pre-
senting a change of circumstances. If the analogy be imperfect, the
application may be erroneous. The expressions of every judge must also
be taken with reference to the case on which he decided; we must look
to the principle of the decision and not to the manner in which the case
is argued upon the bench, otherwise the law will be thrown in to extreme
confusion. The exercise of sound judgment is as necessary in the use
as diligence and learning are requisite in the pursuit of adjudged cases.
Considering the influence of manners upon law, and the force of opinion,
which is silently and almost insensibly controlling the course of business
and the practice of the courts, it is impossible that the fabric of our
jurisprudence should not exhibit deep traces of the progress of society,
as well as of the footsteps of time. The ancient reporters are going very
fast, not only out of use, but out of date, and almost out of recollection.
The modern reports, and the latest of the modern, are the most useful,
because they contain the last, and, it is to be presumed, the most correct
exposition of the law, and the most judicious application of the abstract
and eternal principles of right to the refinements of the science of the
law relating to property. They are likewise accompanied by illustra-
tions best adapted to the inquisitive and cultivated reason of the present
age. But the old reporters cannot be entirely neglected.

Counsel for the defendant in this case very ably and zealously pressed
upon us the necessity for overruling several decisions of this Court of
comparatively recent date *(Williams v. Williams,* 85 N. C., 283; *Wood-
ard v. Paxton,* 101 N. C., 26; *Cowan v. Withrow,* 114 N. C., 558), on
the ground that they were opposed to the mandate of a statute in regard
to docketing justices' judgments and the lien acquired thereby, but we
do not think that this is the case, but, on the contrary, that they are not
plainly inconsistent therewith, even though a contrary construction may
have been permissible. If the reasoning of the Court is not unanswerable,
it is not palpably illogical, or erroneous, and defendant has, therefore,
not made out a case which will induce us to reconsider those decisions.
C. S. Fry was dilatory in docketing his judgment against Alexander

Legler, which was done more than one year after its rendition, and those cases clearly decide that this was too late, and he acquired no lien thereby. We adhere, without hesitation, to the former precedents. It may not be absolutely important in this case to decide that question, as we are of the opinion that if the Fry judgment has been docketed within the time prescribed by the statute, the lien of the judgment could not prevail against the title of the plaintiff acquired by him under the deed to Legler, the mortgage back from him to the Piedmont Plantation Company and the deed from them to the plaintiff. The fact, if it be so, that the debt secured by the mortgage had been assigned to R. W. Pumpelly did not show that the Plantation Company had no further interest in the matter, because it held as mortgagee the legal title, which carried with it the power of sale, and it was necessary for the company to join with Pumpelly in the sale under the power and in the deed to plaintiff in order to a valid exercise of the power (*Williams v. Teachey,* 85 N. C., 402), and the conveyance of the legal and equitable title, though for the purposes of this action the company having the legal title could convey such an interest as would enable the plaintiff, its assignee, to recover in ejectment. *Wittkowski v. Watkins,* 84 N. C., 456, where *Justice Ruffin* said: "The position taken for the plaintiffs in regard to the point of evidence raised on the trial cannot be questioned. They were so clearly entitled to recover the possession of the land in dispute, upon the strength of their legal title as mortgagees, even if their sale to Jones and his reconveyance to them should be held to be invalid, as to make it perfectly useless to inquire into that matter. That may become of interest to the parties at some future day, but could not possibly affect the issues involved in the present action, and therefore was correctly excluded upon the ground of its immateriality."

Plaintiff contended that the title never rested in Legler for even a moment, as he conveyed back to the company, by way of mortgage, at the same time he received the legal title from it, under *Moring v. Dickerson,* 85 N. C., 466; *Hinton v. Hicks,* 156 N. C., 24, and therefore that the lien of the judgment, if it ever existed, did not attach to the land, and while this may be so, it is not necessary that we should decide as to it, and we do not, as we have held that defendant's judgment was never a lien, because not docketed within the time fixed by statute. Whether the fact that the mortgage of Legler back to the company was registered before the deed of the company to him, would play any part in the solution of the matter, we also leave undetermined and as an open question.

We conclude that in no view of the case should the judgment of the court below be disturbed by us.

No error.